# MINNESOTA v. OLSON

No. 88–1916.   Argued February 26, 1990—Decided April 18, 1990

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., *post*, p. 101, and KENNEDY, J., *post*, p. 102, filed concurring opinions. REHNQUIST, C. J., and BLACKMUN, J., dissented.

*Anne E. Peek* argued the cause for petitioner. With her on the briefs were *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Thomas L. Johnson*.

*Stephen J. Marzen* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Dennis*, and *Deputy Solicitor General Bryson*.

*Glenn P. Bruder*, by appointment of the Court, 493 U. S. 989, argued the cause for respondent.*

---

*A brief of *amici curiae* urging reversal was filed for the State of Connecticut et al. by *John J. Kelly*, Chief State's Attorney of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *Linley E. Pearson*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *Frederic J. Cowan*, Attorney General of Kentucky, *Frank J. Kelley*, Attorney General of Michigan, *Mike Moore*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *John P. Arnold*, Attorney General of New Hampshire, *Peter N. Perretti, Jr.*, Attorney General of New Jersey, *Hal Stratton*, Attorney General of New Mexico, *Lacy H. Thornburg*, Attorney General of North Carolina, *T. Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *R. Paul Van Dam*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Mary Sue Terry*, Attorney General of Virginia, *Joseph B. Meyer*, Attorney General of Wyoming, *James B. Early*, Special Assistant Attorney General of Minnesota, *George D. Webster, Jack E. Yelverton*, and *Gregory U. Evans*.

JUSTICE WHITE delivered the opinion of the Court.

The police in this case made a warrantless, nonconsensual entry into a house where respondent Robert Olson was an overnight guest and arrested him. The issue is whether the arrest violated Olson's Fourth Amendment rights. We hold that it did.

I

Shortly before 6 a.m. on Saturday, July 18, 1987, a lone gunman robbed an Amoco gasoline station in Minneapolis, Minnesota, and fatally shot the station manager. A police officer heard the police dispatcher report and suspected Joseph Ecker. The officer and his partner drove immediately to Ecker's home, arriving at about the same time that an Oldsmobile arrived. The driver of the Oldsmobile took evasive action, and the car spun out of control and came to a stop. Two men fled the car on foot. Ecker, who was later identified as the gunman, was captured shortly thereafter inside his home. The second man escaped.

Inside the abandoned Oldsmobile, police found a sack of money and the murder weapon. They also found a title certificate with the name Rob Olson crossed out as a secured party, a letter addressed to a Roger R. Olson of 3151 Johnson Street, and a videotape rental receipt made out to Rob Olson and dated two days earlier. The police verified that a Robert Olson lived at 3151 Johnson Street.

The next morning, Sunday, July 19, a woman identifying herself as Dianna Murphy called the police and said that a man by the name of Rob drove the car in which the gas station killer left the scene and that Rob was planning to leave town by bus. About noon, the same woman called again, gave her address and phone number, and said that a man named Rob had told a Maria and two other women, Louanne and Julie, that he was the driver in the Amoco robbery. The caller stated that Louanne was Julie's mother and that the two women lived at 2406 Fillmore Northeast. The detective-in-charge who took the second phone call sent po-

lice officers to 2406 Fillmore to check out Louanne and Julie. When police arrived they determined that the dwelling was a duplex and that Louanne Bergstrom and her daughter Julie lived in the upper unit but were not home. Police spoke to Louanne's mother, Helen Niederhoffer, who lived in the lower unit. She confirmed that a Rob Olson had been staying upstairs but was not then in the unit. She promised to call the police when Olson returned. At 2 p.m., a pickup order, or "probable cause arrest bulletin," was issued for Olson's arrest. The police were instructed to stay away from the duplex.

At approximately 2:45 p.m., Niederhoffer called police and said Olson had returned. The detective-in-charge instructed police officers to go to the house and surround it. He then telephoned Julie from headquarters and told her Rob should come out of the house. The detective heard a male voice say, "tell them I left." Julie stated that Rob had left, whereupon at 3 p.m. the detective ordered the police to enter the house. Without seeking permission and with weapons drawn, the police entered the upper unit and found respondent hiding in a closet. Less than an hour after his arrest, respondent made an inculpatory statement at police headquarters.

The Hennepin County trial court held a hearing and denied respondent's motion to suppress his statement. App. 3–13. The statement was admitted into evidence at Olson's trial, and he was convicted on one count of first-degree murder, three counts of armed robbery, and three counts of second-degree assault. On appeal, the Minnesota Supreme Court reversed. 436 N. W. 2d 92 (1989). The court ruled that respondent had a sufficient interest in the Bergstrom home to challenge the legality of his warrantless arrest there, that the arrest was illegal because there were no exigent circumstances to justify a warrantless entry,[1] and that respondent's

---

[1] Because the absence of a warrant made respondent's arrest illegal, the court did not review the trial court's determination that the police had

statement was tainted by that illegality and should have been suppressed.[2]   Because the admission of the statement was not harmless beyond reasonable doubt, the court reversed Olson's conviction and remanded for a new trial.[3]

We granted the State's petition for certiorari, 493 U. S. 806 (1989), and now affirm.

## II

It was held in *Payton* v. *New York*, 445 U. S. 573 (1980), that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him.   The purpose of the decision was not to protect the person of the suspect but to protect his home from entry in the absence of a magistrate's finding of probable cause. In this case, the court below held that Olson's warrantless arrest was illegal because he had a sufficient connection with the premises to be treated like a householder.   The State challenges that conclusion.

Since the decision in *Katz* v. *United States*, 389 U. S. 347 (1967), it has been the law that "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas* v. *Illinois*, 439 U. S. 128, 143 (1978).   A subjective expectation of privacy is legitimate if it is " 'one that society

probable cause for the arrest.   436 N. W. 2d, at 95.   Hence, we judge the case on the assumption that there was probable cause.

[2] The State had not argued that, if the arrest was illegal, respondent's statement was nevertheless not tainted by the illegality.   *Id.*, at 98. Likewise, at oral argument before this Court, counsel for the State expressly disavowed any claim that the statement was not a fruit of the arrest.   Tr. of Oral Arg. 4–5.   We will therefore not raise *sua sponte* the applicability of *New York* v. *Harris*, *ante*, p. 14, to the facts of this case.

[3] The court left for the trial court on remand respondent's claims that other evidence—statements by persons present at 2406 Fillmore at the time of the arrest and a statement by Ecker obtained after the police showed him respondent's statement—should also have been suppressed as fruit of the illegal arrest.

is prepared to recognize as "reasonable,"'" *id.*, at 143–144, n. 12, quoting *Katz, supra,* at 361 (Harlan, J., concurring).

The State argues that Olson's relationship to the premises does not satisfy the 12 factors which in its view determine whether a dwelling is a "home."[4] Aside from the fact that it is based on the mistaken premise that a place must be one's "home" in order for one to have a legitimate expectation of privacy there,[5] the State's proposed test is needlessly complex. We need go no further than to conclude, as we do, that Olson's status as an overnight guest is alone enough to show

---

[4] The 12 factors are:

(1) the visitor has some property rights in the dwelling;

(2) the visitor is related by blood or marriage to the owner or lessor of the dwelling;

(3) the visitor receives mail at the dwelling or has his name on the door;

(4) the visitor has a key to the dwelling;

(5) the visitor maintains a regular or continuous presence in the dwelling, especially sleeping there regularly;

(6) the visitor contributes to the upkeep of the dwelling, either monetarily or otherwise;

(7) the visitor has been present at the dwelling for a substantial length of time prior to the arrest;

(8) the visitor stores his clothes or other possessions in the dwelling;

(9) the visitor has been granted by the owner exclusive use of a particular area of the dwelling;

(10) the visitor has the right to exclude other persons from the dwelling;

(11) the visitor is allowed to remain in the dwelling when the owner is absent; and

(12) the visitor has taken precautions to develop and maintain his privacy in the dwelling. Brief for Petitioner 21.

[5] Of course, 2406 Fillmore need not be respondent's "home," temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there. "[T]he Fourth Amendment protects people, not places," *Katz* v. *United States*, 389 U. S. 347, 351 (1967), and provides sanctuary for citizens wherever they have a legitimate expectation of privacy. *Id.*, at 359. Mr. Katz could complain because he had such an expectation in a telephone booth, not because it was his "home" for Fourth Amendment purposes. Similarly, if Olson had a reasonable expectation of privacy as a one-night guest, his warrantless seizure was unreasonable whether or not the upper unit at 2406 Fillmore was his home.

that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.

As recognized by the Minnesota Supreme Court, the facts of this case are similar to those in *Jones* v. *United States*, 362 U. S. 257 (1960). In *Jones*, the defendant was arrested in a friend's apartment during the execution of a search warrant and sought to challenge the warrant as not supported by probable cause.

> "[Jones] testified that the apartment belonged to a friend, Evans, who had given him the use of it, and a key, with which [Jones] had admitted himself on the day of the arrest. On cross-examination [Jones] testified that he had a suit and shirt at the apartment, that his home was elsewhere, that he paid nothing for the use of the apartment, that Evans had let him use it 'as a friend,' that he had slept there 'maybe a night,' and that at the time of the search Evans had been away in Philadelphia for about five days." *Id.*, at 259.[6]

The Court ruled that Jones could challenge the search of the apartment because he was "legitimately on [the] premises," *id.*, at 267. Although the "legitimately on [the] premises" standard was rejected in *Rakas* as too broad, 439 U. S., at 142–148, the *Rakas* Court explicitly reaffirmed the factual holding in *Jones:*

> "We do not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question was unlawful. . . .
>
> "We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own

---

[6] Olson, who had been staying at Ecker's home for several days before the robbery, spent the night of the robbery on the floor of the Bergstroms' home, with their permission. He had a change of clothes with him at the duplex.

home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." 439 U. S., at 141–142.

*Rakas* thus recognized that, as an overnight guest, Jones was much more than just legitimately on the premises.

The distinctions relied on by the State between this case and *Jones* are not legally determinative. The State emphasizes that in this case Olson was never left alone in the duplex or given a key, whereas in *Jones* the owner of the apartment was away and Jones had a key with which he could come and go and admit and exclude others. These differences are crucial, it is argued, because in not disturbing the holding in *Jones*, the Court pointed out that while his host was away, Jones had complete dominion and control over the apartment and could exclude others from it. *Rakas*, 439 U. S., at 149. We do not understand *Rakas*, however, to hold that an overnight guest can never have a legitimate expectation of privacy except when his host is away and he has a key, or that only when those facts are present may an overnight guest assert the "unremarkable proposition," *id.*, at 142, that a person may have a sufficient interest in a place other than his home to enable him to be free in that place from unreasonable searches and seizures.

To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth—"a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable," *Katz*, 389 U. S., at 361 (Harlan, J., concurring).

That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. If the untrammeled power to admit and exclude were essential to Fourth Amendment protection,

an adult daughter temporarily living in the home of her parents would have no legitimate expectation of privacy because her right to admit or exclude would be subject to her parents' veto.

Because respondent's expectation of privacy in the Bergstrom home was rooted in "understandings that are recognized and permitted by society," *Rakas, supra,* at 144, n. 12, it was legitimate, and respondent can claim the protection of the Fourth Amendment.

### III

In *Payton* v. *New York*, the Court had no occasion to "consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search," 445 U. S., at 583. This case requires us to determine whether the Minnesota Supreme Court was correct in holding that there were no exigent circumstances that justified the warrantless entry into the house to make the arrest.

The Minnesota Supreme Court applied essentially the correct standard in determining whether exigent circumstances existed. The court observed that "a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, *Welsh* [v. *Wisconsin*], 466 U. S. 740 [(1984)], or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." 436 N. W. 2d, at 97. The court also apparently thought that in the absence of hot pursuit there must be at least probable cause to believe that one or more of the other factors justifying the entry were present and that in assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered. Applying this standard, the state court determined that exigent circumstances did not exist.

We are not inclined to disagree with this fact-specific application of the proper legal standard. The court pointed out

that although a grave crime was involved, respondent "was known not to be the murderer but thought to be the driver of the getaway car," *ibid.*, and that the police had already recovered the murder weapon, *ibid.* "The police knew that Louanne and Julie were with the suspect in the upstairs duplex with no suggestion of danger to them. Three or four Minneapolis police squads surrounded the house. The time was 3 p.m., Sunday. . . . It was evident the suspect was going nowhere. If he came out of the house he would have been promptly apprehended." *Ibid.* We do not disturb the state court's judgment that these facts do not add up to exigent circumstances.

## IV

We therefore affirm the judgment of the Minnesota Supreme Court.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST and JUSTICE BLACKMUN dissent.

JUSTICE STEVENS, concurring.

While I join the Court's entire opinion, I add this caveat concerning the discussion in Part II of respondent's standing to challenge his arrest on federal constitutional grounds. If we had concluded that he did not have standing as a matter of federal law, the question that would then have been presented would be whether this Court simply should have dismissed the appeal. For we have no power to prevent state courts from allowing litigants to raise federal questions even though they would not have standing to do so in a federal court. See *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 970–971 (1984) (concurring opinion).

Questions of that kind buttress my opinion that the Court grants review in far too many cases in which state courts have protected the constitutional rights of their own citizens. Notwithstanding the Court's decision to enlarge its

own power to review state-court judgments, see *Michigan* v. *Long*, 463 U. S. 1032 (1983), I remain convinced that this power should be used sparingly. See generally *Delaware* v. *Van Arsdall*, 475 U. S. 673, 689–708 (1986) (dissenting opinion). Only in the most unusual case should the Court volunteer its opinion that a state court has imposed standards upon its own law enforcement officials that are too high.

JUSTICE KENNEDY, concurring.

I interpret the last two paragraphs of Part III as deference to a state court's application of the exigent circumstances test to the facts of this case, and not as an endorsement of that particular application of the standard. With that understanding, I join the opinion of the Court.