UNITED STATES of America

v.

Ramiro GARCILAZO–MARTINEZ.

Crim. No. L–94–174.

United States District Court,
S.D. Texas,
Laredo Division.

Nov. 10, 1994.

Juan Ramon Flores, Federal Public Defenders Office, Laredo, TX, for defendant.

Mary Lou Castillo, Asst. U.S. Atty., Laredo, TX, for the U.S.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

Pending is Defendant's motion to suppress, which was heard on October 18, 1994. The Defendant was arrested at a house in the Beacon Lodge area of Zapata, Texas. Zapata Deputy Sheriffs Venegas and Gray entered the premises without a warrant. There they incurred Defendant Garcilazo and Jose Joel Guzman playing pool. The deputies detected the strong odor of marihuana, and both Defendant and Guzman confirmed that they were smoking marihuana at the time. In fact, apparently the first thing the deputies said to the subjects was in the nature of a question about the odor. Guzman replied with a statement in Spanish slang, which was interpreted to mean "we're smoking a joint." The subjects were then escorted out to the garage for a brief pat-down search. Deputy Gray felt what he thought was a knife in a pants pocket of Defendant Garcilazo. He reached in to verify. When he pulled out the small knife, a plastic bag with cocaine and over $200.00 also came out of the pocket. The subjects were subsequently arrested and taken to the Sheriff's Office. Defendant Garcilazo then signed a form granting consent to search his trailer home, where more cocaine was found.

Several issues were presented at the hearing. The first concerns the legality of the search and arrest of the Defendant at the Beacon Lodge house. This issue divides into two subsidiary questions. First, did the Defendant have a reasonable expectation of privacy in the premises, so that he can protest the warrantless entry of the officers? Second, in deciding whether the deputies had reasonable cause to arrest, does the Court consider federal or state law? A final question is whether the Defendant's consent to search his own home was given knowingly and voluntarily.

■ A person alleging a Fourth Amendment violation must demonstrate "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The Fifth Circuit has identified several factors to consider in determining whether an individual has a legitimate expectation of privacy. These include whether he had a possessory interest in the place, whether he had a right to exclude others, whether he exhibited a subjective expectation that the premises would remain free from governmental invasion, whether he took normal precautions to maintain his privacy, and whether he was legitimately on the premises. *United States v. Elwood*, 993 F.2d 1146, 1151 (5th Cir.1993).

The circumstances that brought this Defendant to the Beacon Lodge house are unusual, to say the least. The record owner of the property is Ruben O. Gutierrez. He purchased the property as an investment and never lived in it. Sometime in early 1993, he made a rent-purchase arrangement with one Telesforo Sanchez. The precise details of the arrangement were not explained but Sanchez apparently lived on the property for several months, making periodic payments to Gutierrez. The arrangement supposedly was that these payments would apply to an undescribed purchase price, and title would presumably pass when the payments were completed. This agreement was totally oral, undocumented in any writing. According to Gutierrez, Sanchez summarily left town around December 1993.

Mark Rocha, a 20–year old male describing himself as "a friend" of Sanchez, had begun living with Sanchez around March of 1993. He confirmed that Sanchez left in December, taking all his clothes with him. Within two months, Sanchez returned and removed virtually all the furniture in the house except for the pool table. Rocha says he had not expected this development. He stayed in the house for about a week more, but then left and returned to his parents' home in Zapata. Besides the lack of furniture, an added reason for his move was that the electricity was cut off, leaving the house only with water.

Rocha retained keys to the house and, although neither he nor Sanchez nor anyone else was living there, Rocha would continue to go to the house periodically from March to July of 1993. He would occasionally cut the grass and would sometimes shower and change clothes there. He also became aware that this virtually abandoned house was being used as a hangout by unknown trespassers. The house was described by all witnesses as being filthy with litter, bottles, cans, candles and other debris. Rocha was in a serious car accident on July 28, 1994 and remained in the hospital until September 6. The incident in question occurred on August 16, 1994.

Sometime in June 1994, Rocha encountered Guzman, whom he also described as a friend. Somehow the topic of a car windshield arose. Rocha told Guzman that he owned a windshield located in the abandoned house. He gave Guzman one of his two keys to the house. He told Guzman that he was free to take the windshield and could also play pool whenever he desired. On August 16, 1994, the day of the incident, Defendant Garcilazo was in the house at the invitation of Guzman. This was the first, and apparently only, time the Defendant had been there. He had never stayed there overnight and had no possessions there. As stated earlier, the only furniture in the house was the pool table.

The day before the incident, the Sheriff's Office had received a call advising of a possible burglary at the house. Deputies Venegas and Gray went to the location and looked through a window. They saw no evidence of a burglary as such, but observed that the house was unoccupied, looked abandoned, and appeared to be a "hangout." An inquiry led them to discover Gutierrez as the apparent owner of the property. The next day, Venegas talked to Gutierrez and, among other things, asked if he would like the deputies to periodically check the premises. Gutierrez said that he would. This conversation, combined with Venegas' personal desire to more carefully inspect the premises for possible purchase, led to the visit culminating in the arrest. Venegas first opened a garage door and, to his surprise, saw Guzman's truck. No truck had been there the evening before and the deputies understood the house to be abandoned. They then saw an open door leading from the garage into the house. They entered, guns drawn, and encountered the two subjects playing pool.

■ *Reasonable Expectation of Privacy.* Under the foregoing facts, the Court is convinced that Defendant has failed to demonstrate a legitimate expectation of privacy in the house. Even assuming under these unusual facts that Rocha had authority to grant others permission to go on the property, a defendant's legitimate presence, without more, is insufficient. *United States v. Antone,* 753 F.2d 1301, 1306 (5th Cir.1985). No other factor points to a reasonable expectation of privacy. This Defendant had no legal or possessory right to the property, and he clearly had no right to allow or exclude others from the place. He had never been there before. He was there only because Guzman invited him and was necessarily going to stay only as long as Guzman desired, since the truck belonged to Guzman. Defendant makes no claim that he intended to sleep there or do anything else other than temporarily shoot pool and smoke marihuana.

The Defendant's situation is not comparable to that in *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). This Defendant was not staying overnight in anyone's home. He was not one who "seeks shelter in another's home ... a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.* at 99, 110 S.Ct. at 1689. This was not a location where Defendant sought a private place to sleep, making him "vulnerable" while asleep and unable to monitor his own safety or the security of his belongings. *Id.* Instead this Defendant was at an abandoned house, now being used by assorted trespassers. He was there because he was invited by a friend who had been given a key at least two months earlier to allow him to shoot pool during the daytime and pick up a windshield. The key in turn was given by an individual who already abandoned the house several months earlier and who himself was merely a guest of still another person who had an oral agreement to

buy the house but had also abandoned it. Under these circumstances, the Court is convinced that this Defendant could not reasonably have enjoyed "the everyday expectations of privacy" shared by society. *Id.*

■ *State or Federal Law?* As soon as the deputies entered the house, they obviously had reasonable cause to believe that the Defendants were possessing and consuming a controlled substance, marihuana. Although originally suggesting that Texas law might control, Defendant now concedes that federal law controls the validity of the arrest. Whether the Fourth Amendment has been violated must be determined "solely by looking to federal law on the subject." *United States v. Walker,* 960 F.2d 409, 415 (5th Cir.1992). The proper inquiry, therefore, is not whether the deputies' actions were lawful or valid under state law. *Id.* Instead the inquiry is whether they had probable cause to arrest Garcilazo, *i.e.,* whether the facts and circumstances within the knowledge of the arresting officers was sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed. *Id.* at 416. Possession of marihuana is a criminal offense under both Texas and federal law. The officers plainly had reasonable cause to believe that such an offense was being or had just recently been committed. Very shortly thereafter, they also had cause to believe that the Defendant was in possession of cocaine, another crime.

■ *Consent to Search.* The final issue turns on a credibility choice between the Defendant and Officer Carlos Guerra. The Defendant undoubtedly signed a form authorizing search of his trailer home and his vehicle. According to Guerra, this form was explained to the Defendant in the Spanish language and he understood it. Guerra also testified, without contradiction, that he specifically told the Defendant he had the right to refuse consent. By this time, the deputies had arrested the Defendant with probable cause to believe that he had been consuming marihuana and also that he had a quantity of cocaine on his person. Defendant makes no claim of physical or mental coercion. Indeed, he does not dispute that he knowingly and voluntarily gave consent to search. His sole contention is that his consent was limited to a search of his vehicle, but did not include his residence. The Court is satisfied from a preponderance of the evidence that the Defendant knowingly and voluntarily gave consent to search his trailer home.

The motion to suppress is DENIED.