DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, William E. Callaway ("William"), appeals from his conviction in the Akron Municipal Court for obstructing official business and resisting arrest. We affirm in part, and reverse in part.
 I. {¶ 2} On July 18, 2004, the Akron Police Department received a nonemergency call from Alan Bailey of the Summit County Adult Protective Services, requesting law enforcement and EMS to conduct a "welfare check" at 718 Sylvan Avenue in Akron, Ohio, regarding the health of an elderly, bedridden male at that residence, namely, William's father, Walter Callaway ("Walter"). Bailey informed the police department that he had received information from a physician's office that several calls had been made from the Callaway residence. At no time during his conversation with the police dispatcher did Bailey mention that the calls from the physician's office suggested a medical emergency, and the dispatcher never mentioned to the officer who was to follow up on this call, Officer Alan Hamidi, that this phone call indicated an emergency.
 {¶ 3} When asked to confirm whether he just wanted someone to check to make sure Walter was alright, Bailey explained the predicament as follows:
"Yeah, it's one step above that. I don't think (inaudible) because this is secondhand. We have a history of some kind of situation. [Walter] is, oh he's 81, but he does have need at times for IV. He has dementia and is not compliant with either his diet, he could be dehydrated, he could be in need of an IV. He has a son that seems quite, admit there's a history of some overreacting. He's been calling a health agency, actually a Dr. Scroggins is his attending physician. He's been calling there about every few hours to say his dad needs help. He won't take his father to a hospital for fear his father will be put in a nursing home. Okay. I think this is (inaudible) my opinion, but it's shared, it's shared. The son may not be accurate as concerned because he's a little (inaudible). But there are medical situations the father is in.
"* * *
"There's an adult there with Walter, that's the son. He just called minutes ago to the doctor while I was talking to the doctor's receptionist requesting medical attention again for his father. We're not medical professionals who go out there. So that's why I thought I'd call to you."
 {¶ 4} Without a warrant, Officer Hamidi went to the Callaway residence, dressed in uniform, and knocked on the side door of the house. William looked out the window, but did not notice a marked police car near the house. William then opened the door to see who was there, at which point the officer identified himself and informed William that he was sent there by Adult Protective Custody to follow up on a call. At his trial, William testified that the officer had told him that this call indicated that an elderly man at that location was "being abused," that both the police and the EMS were being sent to the house and that they actually needed to physically see Walter to make sure that he was alright. William responded that Walter was fine, and that the officer was misinformed regarding any sort of abuse.
 {¶ 5} The officer testified at trial that William "seemed to get really agitated," and that he began to pace back and forth behind the door. The officer testified that William then told the officer that he had not called the police and that the officer was not welcome there, and "turned around abruptly to go back towards the door to go back inside the house." Before William could reenter the house, the officer insisted that he needed to come in the house to see Walter, and warned William that if he resisted his entrance, that he would arrest him for obstructing official business. The officer testified that William then "clipped [the officer] on the right shoulder, and [said], no police coming in here and do nothin'." The officer testified that he then informed William that he was under arrest for obstructing official business, and instructed William to put his hands behind his back. At trial, William denied hitting the police officer, and asserted that the officer never actually started to place him under arrest outside of the house.
 {¶ 6} Nevertheless, both William and the officer testified that William then darted towards the partially opened door to go inside the house and attempted to shut the door behind him. The officer testified that he held onto the partially fastened handcuffs, following William's lead into the house. The entire time the officer used pressure points on William's elbow to make him comply, but to no avail; William proceeded into the house, the officer holding on, and moved towards the kitchen. The officer then began to apply knee strikes to William's thigh, which did not make William acquiesce, either. The officer maintained that he continued to tell William that he was under arrest, and that he needed to stop moving.
 {¶ 7} William proceeded into the kitchen towards the telephone. He dialed 911, insisting that he was going to call the officer's supervisor, all the while the officer striking him on the knee. The officer stated that he then noticed that the phone in William's hand was positioned above William's head, apparently indicating to the officer that he was about to be struck with the phone. The officer pulled back from William, but then attempted to immobilize him with a tazer gun shot to the chest. After a second shot, the tazer successfully immobilized William and brought him to the ground.
 {¶ 8} After the officer successfully apprehended William, he called for backup. Then, EMS arrived on the scene.[1] The officer did eventually proceed upstairs to check on Walter; he found him lying on a hospital bed. Walter told the officer that he was fine.
 {¶ 9} Mr. Callaway was charged with one count of obstructing official business, in violation of Akron Codified Ordinance Section 136.11, a second degree misdemeanor, and one count of resisting arrest, in violation of Akron Codified Ordinance Section 136.13, and first degree misdemeanor. Mr. Callaway pled not guilty to the charges.
 {¶ 10} The case proceeded to a jury trial. At the close of the City's case and at the close of all the evidence, Mr. Callaway's counsel moved for a judgment of acquittal pursuant to Crim.R. 29(A). The court denied the motions. A jury found Mr. Callaway guilty of both charges, and the trial court sentenced him accordingly. The trial court stayed Mr. Callaway's sentence pending appeal.
 {¶ 11} Mr. Callaway filed a pro se notice of appeal to this Court from his conviction and sentence. Thereafter, appellate counsel was appointed to represent him, and Mr. Callaway thereby asserts two assignments of error for review.
 II. A. First Assignment of Error
"The city of akron failed to prove beyond a reasonable doubt all elements of the crime of obstructing official business. specifically, the city failed to prove that appellant callaway acted `without privilege' in refusing police entry to his home when the police had no warrant and no exigent circumstances. the city also failed to prove an authorized act and a lawful duty. the failure of proof beyond a reasonable doubt on all elements violated appellant callaway's right to due process of law under the due processs clause of the fourteenth amendment."
 {¶ 12} In his first assignment of error, Mr. Callaway contends that the State failed to prove beyond a reasonable doubt all elements of the offense to obstructing official business. Thus, Mr. Callaway maintains that his conviction for obstructing official business was not supported by sufficient evidence. We agree.
 {¶ 13} "The test for `insufficient evidence' requires the court to view the evidence in the light most favorable to the prosecution, and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Leggett (Oct. 29, 1997), 9th No. 18303, at 4. We must determine, as a matter of law, whether the evidence was legally sufficient to support a conviction. Id. at 4. "In essence, sufficiency is a test of adequacy." State v.Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 14} Mr. Callaway maintains that the State failed to establish that Mr. Callaway acted without privilege in refusing police entry into his father's home, and that the police officer was engaged in an authorized act and lawful duty at the time. Mr. Callaway was convicted of obstructing official business, in violation of Akron Codified Ordinance Section 136.11, which provides, "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties." The police officer in this case appeared at the residence without a warrant. The Fourth Amendment confers the constitutional right upon a defendant to refuse to consent to a warrantless entry, and the assertion of this right cannot be a crime.Camara v. Mun. Court (1967), 387 U.S. 523, 530-540, 18 L.Ed.2d 930.
 {¶ 15} The State responds that Mr. Callaway cannot assert a privilege because he did not have a reasonable expectation of privacy in his father's home and because the evidence does not establish that he was an overnight guest or otherwise had any proprietary interest in the home. The Fourth Amendment protects against unreasonable intrusions into an area in which the individual attempting to invoke the Fourth Amendment protection has an actual subjective expectation of privacy, which, when viewed objectively, is justifiable under the circumstances of the case.State v. Robinson (1995), 103 Ohio App.3d 490, 494, citing Smith v.Maryland (1979), 442 U.S. 735, 740, 61 L.Ed.2d 220. William maintains that he was an invited guest at his father Walter's home, and that he has sufficient contact and control over Walter's residence to create a legitimate expectation of privacy in the home. A host's ultimate control of his home does not obviate the possibility that a guest in his home may have a legitimate expectation of privacy even though the guest does not have a legal interest or authority to determine who enters the home.Minnesota v. Olson (1967), 495 U.S. 91, 99, 109 L.Ed.2d 85. "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." (Internal quotations omitted.) Id. at 92, citing Katz v. United States (1967), 389 U.S. 347, 19 L.Ed.2d 576. William maintains that his expectation of privacy in his father's home is one that society would be willing to recognize as legitimate and thus protected by the Fourth Amendment.
 {¶ 16} William does not live with Walter. However, the nature of the time he spends at Walter's home is closer in character to that of an overnight guest. William has the responsibility of providing Walter's home care. William comes to the home to take care of an individual with whom he had a strong relationship, his father. Furthermore, William's care-giving responsibilities to Walter and Walter Jr. necessitate that he spend frequent and lengthy periods at the home. Walter has dementia, is bedridden and cannot walk, and has difficulty feeding and cleaning himself. Additionally, William watches over his brother Walter, Jr. who has a mental disorder and who lives with their bedridden father. William was not at the home to pursue some sort of business venture or for his own use; rather, he was there because he played an integral role in Walter's well being and survival. Cf. Minnesota v. Carter (1998),525 U.S. 83, 91, 142 L.Ed.2d 373. Thus, we disagree with the State's position, and conclude that Mr. Callaway did indeed have a reasonable expectation of privacy in his father's home.
 {¶ 17} Although Mr. Callaway did not protest the officer's presence at his front door, his subsequent attempt to close the door constituted an exercise of his privilege to refuse entry and the termination of any consensual encounter. See, e.g., State v. Cummings (Jan. 16, 2002), 9th Dist. No. 20609, at *11. Without a warrant, the officer needed more than the mere possibility of harm to justify entry over William's objection. The police officer conceded at trial that he did not have knowledge of whether the phone call received by the dispatcher had been verified for legitimacy. There is no indication that an inquiry was made into the reliability of the informant who made the call. William insisted that he was not the one that had called EMS or the police initially; he noted that there was a possibility that either Walter or Walter, Jr. may have tried to contact EMS.
 {¶ 18} It is clear that an emergency did not exist at the residence; the call did not suggest that there was an imminent need to save a life or avoid serious injury. See State v. Applegate (1994), 68 Ohio St.3d 348,349. While the EMS was dispatched to the scene as well, they did not arrive until after the police officer had already encountered William, and engaged him in what became an argumentative conversation and physical struggle. While the police officer did eventually make his way up to the second floor to see Walter, once he got to Walter he could do no more than simply ask Walter if he was alright. The police officer did not examine him, or ask him any medical questions, and rightly so; such a task was appropriately left to the EMS to handle. Given the information relayed to the officer, there was no emergent medical need that he could satisfy. Furthermore, other than William's nervous pacing backwards and forwards in front of the door while contemplating how to handle the police officer's presence, there is nothing in the testimony to indicate anything suspicious or criminal was occurring at the residence.
 {¶ 19} Another officer who arrived at the scene testified as to the commonality of answering calls to check someone's welfare. Certainly, if a call is made that indicates a medical emergency or even the possibility of imminent death, such a situation, given the circumstances, may warrant taking any action necessary to enter the home and check the individual. However, that was not the case here. Walter was not alone. He was being attended to by William, who attested to his father's physical state, and, as even the caller stated, had made calls to Walter's physician to seek medical help. Cf. State v. Russell (1998), 127 Ohio App.3d 414,418 (no response when law enforcement knocked on the door of a missing person). William testified that the family frequently made calls to Walter's physician for medical assistance. William did testify that no one in the family made a call to the doctor the day the officer came to the house.
 {¶ 20} Based upon the foregoing, we conclude the State failed to establish beyond a reasonable doubt that William was acting without a privilege and that the police officer's entry into the home was lawful. See Leggett, at 3-4; Section 136.11. Therefore, we find that William's conviction for obstructing official business is not supported by sufficient evidence. Accordingly, Mr. Callaway's first assignment of error is sustained.
 B. Second Assignment of Error
"The city of akron violated section 3, article XVIII, of the ohio constitution when it enacted akron codified ordinance § 136.13 [resisting arrest] as it conflicts with R.C. § 2921.33 in permitting convictions where the arrest was not proven to be lawful. since the akron ordinance under which appellant callaway was convicted is unconstitutional, his conviction was void."
 {¶ 21} In his second assignment of error, Mr. Callaway asserts that Akron Codified Ordinance Section 136.13 is unconstitutional because it is in conflict with R.C. 2921.33, resisting arrest, and that therefore, his conviction for resisting arrest is void.
 {¶ 22} Mr. Callaway presents a constitutional challenge that he did not raise at the trial court level, and that he therefore did not properly preserve for appeal. "Constitutional rights may be lost as finally as any others by a failure to assert them at the proper time. Accordingly, the question of the constitutionality of [an ordinance] must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." (Internal citations and quotations omitted.) State v. Awan (1986), 22 Ohio St.3d 120, 122. Because Mr. Callaway raises this issue for the first time on appeal, we decline to address it. See id. at syllabus. Mr. Callaway's second assignment of error is overruled.
 III. {¶ 23} Mr. Callaway's first assignment of error is sustained. Mr. Callaway's second assignment of error is overruled. The conviction in the Akron Municipal Court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this decision.
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Whitmore, P.J. Moore, J. Concur.
[1] The officer also encountered William's brother, Walter Callaway, Jr., during this series of events inside the residence. The two engaged in a scuffle, and Walter, Jr. was also eventually charged.