RYAN, Circuit Judge, concurring.
While I concur in my colleagues’ decision to affirm Thelmon Stuckey’s convictions, I do not agree that the circumstances of Stuckey’s stay at his friend’s apartment in Georgia, combined with the terms of his supervised release, stripped him of his Fourth Amendment standing to challenge the seizure of the papers in the backpack on which the rap lyrics were written. I am convinced that the rap lyric papers were seized in violation of Stuckey’s constitutional rights under the Fourth Amendment, but I also think that the trial court’s refusal to suppress the challenged lyrics was harmless error, beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 23-24, 87 S.Ct. 824 (1967).
I.
The law seems to be well settled that whether a defendant has standing to bring a constitutional challenge for police invasion of his private sleeping room, depends, in part, upon whether he is an invited overnight guest in a private dwelling (or a hotel patron), or merely a “casual visitor” occupying a premises, including a private *493 dwelling or a hotel room, for the primary purpose of utilizing the premises as a temporary “hide-out” or to conduct a business transaction. See, e.g., Minnesota v. Carter, 525 U.S. 83, 90, 107, 119 S.Ct. 469 (1998); Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S.Ct. 1684 (1990); United States v. Allen, 106 F.3d 695, 699 (6th Cir.1997). Generally, the former has a legitimate expectation of privacy, and therefore, standing to assert a constitutional privacy deprivation under the Fourth Amendment, and the latter has not.
The district court found that: (1) Stuckey paid the apartment owner $2,000 and obtained a key for the use of the apartment for an undetermined duration; (2) at the time of his arrest, Stuckey had been asleep in the apartment for several hours; and (3) he had various articles of personal property in the apartment, including clothing hanging in a closet and several items of jewelry.
There was no finding — and there is no evidence — that Stuckey was using the apartment merely for a business transaction of any kind, legal or illegal. In my judgment, the district court’s findings compel us to conclude that Stuckey’s occupancy of his friend’s apartment more closely resembles an overnight guest or hotel patron than a “casual visitor” conducting a business transaction. See Carter, 525 U.S. at 90, 107, 119 S.Ct. 469. And I cannot agree that Stuckey’s status on supervised release diminished, in any respect, his standing to challenge the search of his vehicle and backpack, and the seizure of the “bundle of papers” in which the rap lyrics were found.
Accepting, as we must, under United States v. Knights, 534 U.S. 112, 122 S.Ct. 587 (2001), that the terms and conditions of one’s supervised release could diminish his expectation of privacy in his sleeping rooms, such as to eliminate his Fourth Amendment rights, Stuckey’s situation was not such a case. In Knights’s ease, the terms of his supervised release authorized the police to conduct a search of any place where Knights might be found, with or without a search warrant; Stuckey’s supervised release terms permitted only “a probation officer to visit at any time at home or elsewhere and [required Stuckey to] permit confiscation of any contraband observed in plain view by the probation officer.” (Emphasis added.)
In my judgment, we ought to decide whether the search of Stuckey’s vehicle and backpack and seizure of the papers exceeded the scope of the warrant authorizing the search. I believe it did. The warrant authorized a search for “marijuana” and nothing else. Indeed, the magistrate, or someone at the magistrate’s direction, struck from the affidavit language which would have allowed a search for “documents” or other evidence of marijuana possession.
Since the seizure of personal papers was not expressly authorized by the search warrant, their seizure was lawful only if the papers on which the rap lyrics were in “plain view” and their incriminating nature was “immediately apparent.” United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir.1997). The papers “bundled together” in the backpack bore various handwritten and printed words and facially gave no indication of any relationship to marijuana, or any other crime. It was not until after the papers were seized, and the language of the text analyzed and interpreted as rap lyrics by someone other than the seizing officer, and after that, connected to Darbins’s death, that the lyrics were first adjudged an incriminating admission. Even if it were conceded that the papers bearing the rap lyrics were in plain view (a doubtful proposition), it is clear that it was not “immediately apparent” to the seizing *494 officer that the papers were plainly incriminating. It would be quite a different case if the writing on a sheet of paper immediately observable to the officer upon opening the backpack stated: “I, Stuckey, killed Darbins, the snitch,” or something of the sort. In such a case, there would be no analytical second step necessary to appreciate the incriminating character of the words written on the paper. But in Stuckey’s case, the words on the papers were meaningless until a police officer or someone else in authority took the analytical “second step” of interpreting the words as rap lyrics having something to do with a homicide of a “snitch” whose body was wrapped up, taped, and disposed of, as Darbins’s was.
The rap lyric papers were not named in the search warrant and them seizure was not within the “plain view exception” to the warrant requirement of the Fourth Amendment. Therefore, the seizure violated Stuckey’s Fourth Amendment rights and it was error for the district court to deny Stuckey’s motion to suppress. The next question is whether the court’s error in receiving the lyrics in evidence was harmless. Chapman, 386 U.S. at 23-24, 87 S.Ct. 824.
II.
The government aggressively argued the incriminating nature of the rap lyrics in its closing argument, pointing out how the lyrics describe the murder of a “snitch” and the disposal of his body — all indisputably descriptive of the Darbins killing. There is no question that the government relied heavily on this evidence. But the rap lyrics on the papers seized from the backpack were not the only incriminating lyrics in evidence. The government introduced similarly incriminating rap lyrics from a publicly released CD album written and performed by Stuckey, which also contained detailed accounts of silencing informants and stuffing their bodies in the trunks of cars.
In addition to the admissible rap lyrics evidence, Steven Felder was an eyewitness to the murder and testified that he saw Stuckey shoot Darbins, and helped Stuck- • ey dispose of Darbins’s body. There is no question that Felder’s credibility was suspect and Stuckey’s counsel had no trouble impeaching him. But Felder’s heavily self-incriminating testimony was clear, direct, and detailed, and whether Felder testified truthfully as to Darbins’s murder was a matter for the jurors, not this court, to assess. United States v. Martin, 25 F.3d 293, 297 (6th Cir.1994).
Because the rap lyrics were improperly admitted into evidence, the analysis of the harmless error test hinges on whether the jurors would have convicted Stuckey without the introduction of the seized, lyrics. I think they would have, because the evidence that Stuckey killed Darbins was overwhelming, even without the rap lyrics that should have been suppressed.
While I think the district court erred in admitting the seized lyrics, I am not convinced that the error affected the outcome of Stuckey’s trial, McCombs v. Meijer, Inc., 395 F.3d 346, 358 (6th Cir.2005), and therefore, I concur in my colleagues’ judgment affirming Stuckey’s convictions.