OPINION
{¶ 1} Appellant, Anthony Logel, appeals from a conviction of possession of crack cocaine, pursuant to a no-contest plea. The facts underlying this appeal are set out in the State's brief and are not essentially contested. They are as follows: *Page 2 
 {¶ 2} On May 11, 2006, Dayton police officers were dispatched to the intersection of East Third Street and South Westview Avenue in response to a report of shots being fired and that several juveniles ran into a large building at that location. An anonymous caller gave a description of the alleged shooter to the police dispatcher. Officers Wendy Stiver and Donna Davis responded to the scene approximately two minutes after the call came in. Upon arrival, the officers did not observe a crowd as reported in the call. At the corner of the intersection, the officers observed an apparently vacant apartment building with an exterior door propped open. The building, located at 3822 East Third Street, had the windows on the ground floor broken out, and it appeared that no one was living there. (Tr. 10.) The officers entered the apartment's common area through the open door and, once inside, they heard the sound of a male voice. The officers followed the voice to an apartment where they looked through the open door and saw Defendant Logel talking on a cell phone. Like the rest of the building, the apartment was uninhabitable and in disrepair.
 {¶ 3} The officers then entered the apartment and asked Logel who he was, what he was doing inside the apartment, and if he knew about the gunshots they were investigating. While the officers did not know Logel, they were aware of who he was. Officer Stiver testified that she had never had contact with Logel, but she was aware that he had a history of being confrontational with police officers. (Tr. 16, 19.) Stiver also knew that Logel's actions had previously put officers' safety at risk. (Tr. 20.) Due to the nature of the dispatch, Officer Stiver asked Logel if he had any guns or weapons on him. Logel responded that he did not hear any gunshots. As Officer Stiver approached Logel to pat him down, Logel reached into his pocket and pulled out a set of keys. As he did so, a large bag of crack fell out of his *Page 3 
pocket. The officers immediately recognized the bagged substance to be crack cocaine. When asked if the crack was his, Logel denied it was. The officers then patted Logel down where they found additional drugs and a crack pipe. Logel was then arrested for possession of crack cocaine. Officer Stiver admitted on cross-examination that Logel was not wearing the clothing described to the police by the anonymous caller.
 {¶ 4} Appellant contends in his first assignment of error that the trial court erred in finding that he did not have standing to contest the entry by the police into the apartment in which he was performing maintenance. He notes that he had control over the apartment in that he had a key to the unit provided by the owner. He contends he had a reasonable expectation of privacy in the apartment, and he did not surrender that expectation by propping the door open to remove damaged drywall. The State argues that the mere fact that Logel had permission to be in the vacant apartment for repair purposes did not confer standing upon him. In short, the State argues Logel had no reasonable expectation of privacy in the apartment entered by the police.
 {¶ 5} In Minnesota v. Olson (1990), 495 U.S. 91, 110 S.Ct. 1684,109 L.Ed.2d 85, the United States Supreme Court held that overnight guests had standing to object to a search of his host's home. Justice White wrote on behalf of the Court:
 {¶ 6} "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of *Page 4 
town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.
 {¶ 7} "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth-'a temporary private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable.' [Katz v. U.S.], 389 U.S., at 361 (Harlan, J., concurring)." Id. at 98-99.
 {¶ 8} The limits of Olson were tested in Minnesota v. Carter
(1998), 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373. In Carter, the defendants had paid the lessee of an apartment a small amount of cocaine in return for the use of the apartment to bag cocaine, and the defendants were spotted by an officer who looked through a drawn window blind. The Minnesota Supreme court held that the defendants had a legitimate expectation of privacy in the apartment, because property owners have the right "to invite persons into the privacy of their homes to conduct a common task, be it legal or illegal activity." State v.Carter (Minn. 1997), 569 N.W.2d 169, 176. The Supreme Court reversed, distinguishing defendants from *Page 5 
the "overnight guest" in Olson: "Respondents here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with [the lessee], or that there was any other purpose to their visit. Nor was there anything similar to the overnight guest relationship in Olson to suggest a degree of acceptance into the household. While the apartment was a dwelling place for [the lessee], it was for these respondents simply a place to do business." Minnesota v. Carter, 525 U.S. at 90. The Court, in an opinion written by Chief Justice Rehnquist, concluded that the apartment, for defendants' purposes, was more like a commercial premises and defendants' expectation of privacy was therefore less. Id. at 90-91.
 {¶ 9} Justice Scalia, joined by Justice Thomas, joined the Court's opinion, but pointed out that they eschewed the Katz "reasonable expectation of privacy" analysis as not grounded in the constitutional text, and concurred on the ground that the text and history of the Fourth Amendment made clear that one is only entitled to protection in one's own home or dwelling place ("right . . . to be secure . . . intheir houses"). Id. at 96-97 (Scalia, J., concurring). Justice Kennedy concurred, reasoning that while regular social guests might have a reasonable expectation of privacy in a host's home, these defendants were not social guests, but business visitors with "no meaningful tie or connection to the owner, the owner's home, or the owner's expectation of privacy." Id. at 102 (Kennedy, J., concurring). Justice Breyer concurred in the judgment, believing that even if the defendants were entitled to Fourth Amendment protection, the officer's "peek" through the blinds was made from a public area and was appropriate under the plain view doctrine. Id. at 105-106 (Breyer, J., concurring). Justice Ginsburg, joined by Justices Stevens and Souter, dissented, arguing that "through the *Page 6 
host's invitation, the guest gains a reasonable expectation of privacy in the home." Id. at 108 (Ginsburg, J., dissenting). She pointed out that Katz had found a legitimate expectation of privacy in a business call made from a public phone booth, and she could not distinguish the facts in this case. Id. at 111.
 {¶ 10} An Illinois court of appeals addressed a similar fact pattern in People v. Rios (lll.App.1996), 664 N.E.2d 153, The facts are as follows:
 {¶ 11} "On August 4, 1993, defendants Carlos Rios and Ariel Hurtado allegedly agreed to sell two kilograms of cocaine to an undercover police officer. Hurtado showed Officer Bautista two kilograms of cocaine in a basement apartment at 2503 North Lawndale and agreed to sell the cocaine for $48,000. Officer Bautista left the apartment to get the money. When police returned to the apartment, Rios ran inside and shut the door. The police knocked in the door, entered the apartment, and arrested Rios and Hurtado. The police then searched the apartment and found two kilograms of cocaine in the bedroom, three kilograms of cocaine in the heating and air conditioning unit, and half a gram of cocaine in the refrigerator.
 {¶ 12} "Defendants filed a motion to suppress evidence and argued that their Fourth Amendment privacy rights were violated when the police entered and searched the apartment without a warrant. The State objected and argued that defendants lacked standing to contest the warrantless search. A hearing was held on the motion to suppress.
 {¶ 13} "Ariel Hurtado testified that he was doing carpentry work in a basement apartment on North Lawndale in Chicago on August 4, 1993, when the police arrested him and Carlos Rios and then searched the apartment. Roberto Macias owned the building. He *Page 7 
hired Hurtado and Rios to replace the floor tile and perform carpentry work in the basement apartment. Macias was Hurtado's brother-in-law. Hurtado testified that Delfino Torrez had leased the apartment and was out of town. Hurtado did not know Torrez and did not know whether Torrez would return to the apartment. Rios came to the apartment to help Hurtado every day after he left his day job. Hurtado and Rios had been working in the basement apartment for two weeks before August 4, 1993.
 {¶ 14} "The only furniture in the apartment was a pool table and chairs. Macias gave Hurtado two keys to the apartment. Hurtado stated that he kept no other possession there. Hurtado testified that Rios kept no possessions in the apartment. He and Rios made and received telephone calls at the apartment. They also ate there. Hurtado spent four nights in the apartment during the two weeks it was under repair. Rios never spent the night.
 {¶ 15} "Roberto Macias testified that he owned the building and hired Hurtado and Rios to repair the floor and wood in the basement apartment. Delfino Torrez leased the apartment and had gone to Mexico two weeks before August 4, 1993. When Torrez left, he gave Macias a rent deposit.
 {¶ 16} "Macias allowed Hurtado and Rios to use the telephone in the apartment. He did not give them permission to spend the night. No one else had access to the apartment. Macias checked to see how the work was coming along once during the two week period before August 4, 1993. He saw that Hurtado kept his tools in the apartment and Rios and Hurtado had sodas in the refrigerator.
 {¶ 17} "The trial court ruled: `I will hold that the defendants do have sufficient standing to object to the intrusion into the premises. * * * [I]t is also clear from the evidence that the *Page 8 
defendants had authority to be there through the landlord, who had the obligation, and apparently even of the tenant to do work on the premises, repair the premises.'" Id. at 155.
 {¶ 18} The court of appeals reversed the trial court's finding that the defendants had standing to object to a search of the apartment. The court noted that in determining whether an expectation of privacy is reasonable, it had previously considered whether the defendants were legitimately present in the area searched, whether they had a possessory interest in the area or property seized, whether they had the ability to exclude others, and whether they had a subjective expectation of privacy in the area searched. Id. (citations omitted).
 {¶ 19} The court noted that the defendants were legitimately on the premises making repairs for two weeks before the search, and they had a possessory interest in the property seized. Id. The court noted that those facts alone were not determinative of whether the defendants had a protectable Fourth Amendment interest in it. Id.
 {¶ 20} The court provided the following: "We disagree with the conclusion that the defendants have a possessory interest in the apartment because they stored tools, made telephone calls, and Hurtado stayed overnight on four occasions. Although Hurtado spent four nights in the apartment, the owner stated that defendants did not have permission to spend the night. We believe that storing required tools at a work site until the work is completed and making telephone calls, is insufficient to vest the defendants with a possessory interest in the work site.
 {¶ 21} "Nor did defendants have the ability to exclude others. Although the owner gave Hurtado keys, there is no evidence in the record that the owner or the lessee gave the defendants authority to exclude others. *Page 9 
 {¶ 22} "We also believe the defendants do not have a subjective expectation of privacy. `A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable.' People v. Taylor, 245 Ill.App.3d 602, 610, 185 Ill.Dec. 587, 614 N.E.2d 1272 (1993). Courts have recognized the importance of workplace privacy and held that a person may have a legitimate expectation of privacy in an area where he works. See O'Connor v.Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); [Mancusi v. DeForte], 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154. The Court inO'Connor stated: `Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.'O'Connor, 480 U.S. at 718, 107 S.Ct. at 1498, 94 L.Ed.2d 714. We have no quarrel with a case by case analysis or those cases that inject a `home away from home' analysis into the discussion. A diary in a locked office desk, or the intimate memorabilia many workers surround themselves with at work to warm a cold environment come to mind. But that is not this case. Hurtado and Rios were allowed access to an unoccupied apartment temporarily for one purpose: to repair it. We find no evidence of any merit that would warrant a subjective belief in a reasonable expectation of privacy in the basement apartment." Id. at 155-56.
 {¶ 23} In U.S. v. Higgins (C.A.10, 2002), 282 F.3d 1261, the court found that a business invitee with permission from the owner to be in the house for the specified purpose of cleaning and repairing it did not give the defendant a reasonable expectation of privacy in the premises that society was prepared to accept, even if he intended to convert the house into his residence and had moved some of his personal property into the house. Id. at 1272. Thus, he could not challenge a search of a house in which officers found equipment for *Page 10 
manufacturing methamphetamine, where the house could not reasonably have been used as a residence at the time of the search due to disrepair, and defendant failed to show that locking fence with key in his possession made house secure. Id. at 1271-72.
 {¶ 24} The court noted the following in affirming the trial court's overruling Higgins' motion to suppress:
 {¶ 25} "The government argues that in Minnesota v. Carter,525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Supreme Court created a bright line rule between overnight guests and persons present in another's residence only for business purposes. That may be overstating the holding of Carter, in which the deciding vote was cast by Justice Kennedy, who observed in his concurring opinion that `almost all social guests have a legitimate expectation of privacy . . . in their host's home.' 525 U.S. at 99, 119 S.Ct. 469. Nevertheless, Carter is surely an important development in the law in this area. We have said thatCarter `effectively heightened the burden for a defendant claiming a reasonable expectation of privacy in a dwelling other than his own home, when the defendant's presence in the dwelling is for a commercial or business purpose.' [U.S. v. Gordon] 168 F.3d at 1226. The parties have not brought to our attention any case closely analogous to the unusual circumstances here, in which the property was not at the time of the search usable as a dwelling, but the defendant professed to have plans to occupy the premises in the near future, after having cleaned and repaired the place.
 {¶ 26} "Mr. Higgins argues that the district court ignored his testimony about having a key to the gate, having brought personal property into the house, and attributing his delay in moving into the house to the condition of the premises and the cold weather. As to the last of *Page 11 
these points, we have already explained that the condition of the premises weighs very heavily against Mr. Higgins' position.
 {¶ 27} "As to his possession of the key to the padlock on the fence and his having brought personal property into the abandoned house, we conclude that these facts make no difference in these circumstances. Although having possession of a key may be relevant, here Mr. Higgins' evidence failed to establish that locking the exterior fence made these premises secure. To the contrary, with the windows smashed out and the doors off the hinges, as described in Mr. Higgins' own testimony on direct examination, it seems likely that the padlock was ineffective and that anyone wishing to do so could have walked right in, past the doors which were swinging loose on their hinges, or crawled in any broken window. Nor is such possibility merely theoretical. It appears from the evidence at trial that this had actually happened; indeed, the defense was centered on this possibility. Thus, counsel for Defendants brought out in cross-examination of government witnesses and in direct examination of Mr. Higgins and Ms. Caple that chemicals were on the premises prior to the date of the arrests. In these particular circumstances, we can give no weight to Mr. Higgins' possession of the key because he failed to carry his burden of proving that this gave him control over the premises." 282 F.3d at 1271-1272.
 {¶ 28} We agree with the trial court that Logel failed to demonstrate that he had standing to object to the entry of the police into the vacant apartment Logel was repairing for the owner. Although the defendant had a key to the apartment, he demonstrated no other indicia that would suggest he had a reasonable expectation of privacy in the apartment. In fact, he indicated he was there to remove damaged dry wall and had left the door propped *Page 12 
open for ease in removing the dry wall. He could therefore expect members of the public to enter the vacant apartment under those circumstances. Also, the search of the vacant apartment was reasonable under the "exigent circumstances" exception to the warrant requirement. It was reasonable for the police to enter the vacant apartment to find if the reported shooter might be found inside. The appellant's first assignment of error is Overruled.
 {¶ 29} In his second assignment, Logel argues the trial court erred in refusing to suppress the drugs and pipe recovered in the search of him. Logel argues that the police officers did not have any reason to believe he might be armed and dangerous because he did not meet the description of the alleged shooter. The State argues that the police did not seize the crack cocaine but that it was dropped in plain view by the defendant. We agree. Logel removed his keys and the crack in response to Officer Stiver's asking him if he had any guns or weapons on him. She did not tell Logel she was going to pat him down. If an article is in plain view, neither its observation nor seizure involves an invasion of privacy. State v. Williams (1978), 55 Ohio St.2d 82, 85,377 N.E.2d 1013. The second assignment of error is Overruled.
 {¶ 30} In his third assignment, Logel contends the trial court erred in holding that his actions of removing his keys and crack from his pocket was voluntary. He contends he would not have removed those items if he had not been told by Officer Stiver that she was going to pat him down.
 {¶ 31} Officer Stiver testified as follows upon questioning by the prosecution:
 {¶ 32} "Q. And did he make any response when you indicated — well, let me back up. How did you inform him that you were going to pat him down? *Page 13 
 {¶ 33} "A. Uh . . . I asked him if he — you know, I walked around behind him and said: `You don't have any guns or knives or weapons on you, do you?'
 {¶ 34} "Q. And did he make any response?
 {¶ 35} "A. Uh . . . he said he didn't hear any gunshots.
 {¶ 36} "Q. And then did — how — then how did you inform him actually that you were-or were you in the process of patting him . . .
 {¶ 37} "A. Uh . . . just in . . .
 {¶ 38} "Q. Down as you said that?
 {¶ 39} "A. The process of — of doing that. Uh . . . it's — it's very common once you ask the question: `Do you have any weapons, knives, guns, hand grenades on you?' People who are familiar with the procedure know that you're patting them down for weapons, knives, guns.
 {¶ 40} "Uh . . . as soon as I started to approach Mr. Logel, he reached into his left pocket and pulled out a — a key — a large key chain with a lot of key chains on it and keys, and when he did that a — a bag of crack fell out of his pocket." (Tr. 13.)
 {¶ 41} Logel did not testify that he removed the items from his pocket because he thought Officer Stiver was going to pat him down. He may have been trying to show Officer Stiver that he had a key to the apartment. In any event, in light of the report that shots had been fired from the vicinity of the apartment building, it was reasonable for the officers to frisk the only person they found in the building. The third assignment of error is Overruled.
 {¶ 42} The judgment of the trial court is Affirmed.
 WOLFF, P.J., and DONOVAN, J., concur. *Page 1