In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00242-CR
______________________________


MELVIN WAYNE GOULDSBY, JR., Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 31871-B


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Melvin Wayne Gouldsby, Jr., pled guilty before the trial court, without a plea
agreement, to two counts of possession of controlled substances, four grams or more but
less than 200 grams of cocaine, and four grams or more but less than 400 grams of 3,4
methylenedioxy methamphetamine, alleged to be offenses arising out of the same criminal
episode.


 Punishment was assessed on each count at twelve years' imprisonment, and
the sentences were ordered to run concurrently.


 Gouldsby appeals, alleging, in a single
point of error, that the trial court erred in overruling his motion to suppress evidence. We
affirm.
Background
Â Â Â Â Â Â Â Â Â Â Two police officers testified for the State at the hearing on Gouldsby's motion to
suppress. Longview police officer Doug Brinkley testified that, on January 9, 2004, at 2:30
a.m., he was patrolling a "heavy narcotic area" of his beat when he observed the front door
of a house standing open at 704 South 12th Street. Because he had not observed any
activity around this house, Brinkley considered it a vacant house. On observing the front
door standing open, he stopped to make a "[w]elfare check," "[m]aking sure no one has
used the vacant house for prostitution or anything like that, vagrant, transients living inside
it or anything like that." As Brinkley approached the front door, he yelled his identity and
entered the house. There was no other person inside the house, but Brinkley observed
a television set and VCR in the living room and a mattress on the floor in a bedroom. In
the kitchen, he observed marihuana "trimmings" on one countertop, and on another
countertop, he observed a plastic bag of thirty to thirty-five clean small jars. Brinkley
testified these jars were like those he had seen on the street used to sell liquid codeine. 
Because there was "[n]o food, no clothes, no everyday supplies for the house, such as
toilet paper and things like that," Brinkley concluded no one was living at the residence. 
Because of the marihuana residue and the bag of jars he observed, he concluded this
house was "a cut house where narcotics are cut up to be sold on the street." 
Â Â Â Â Â Â Â Â Â Â At the end of Brinkley's shift, around 6:00 a.m., he advised his sergeant, Richard
Spruill, and the officer who worked the same area on the day shift, John Ross,


 about what
he had observed at 704 South 12th Street. Ross told Brinkley the owner of that property
had told him that he (the owner) would file trespassing charges against anyone caught on
the property.
Â Â Â Â Â Â Â Â Â Â Late the next evening, when Brinkley was patrolling on his regular night shift, he
again passed by 704 South 12th Street and observed two persons standing on the front
porch. Brinkley called Spruill and advised him that he (Brinkley) wanted to get the people
standing on the porch identified. Spruill met Brinkley near the house, and the two then
approached the house on foot. The two people whom Brinkley had observed standing on
the porch were no longer there. Brinkley went to the front of the house, and Spruill went
to the back. As Brinkley approached the front door, a person, later identified as Gouldsby,
opened a small peephole door in the bigger door, and Brinkley said, "Hey, I want to talk to
you, will you open the door up?" Gouldsby responded, "Okay," but then shut the peephole
door, pulled out the doorknob to the bigger door, threw the doorknob to the floor, and
started running toward the back of the house. Brinkley alerted Spruill by radio and then
heard Spruill yelling at Gouldsby. Being unable to enter the house by turning the
doorknob, Brinkley pushed the door open with his shoulder. As he went through the door,
he saw Gouldsby coming back toward him. Brinkley pointed his firearm at Gouldsby,
whom Brinkley then recognized as a person he knew, called Gouldsby by name, and told
him to get on the floor. As Gouldsby was getting down on the floor, he pulled "baggies" of
narcotics out of the inside of his jacket and threw them on the floor. Gouldsby then put his
hands up, and Spruill approached him from behind and put handcuffs on him. No one else
was in the house. A search of Gouldsby's person revealed a small quantity of marihuana,
a set of digital scales, alcohol pads, a cell phone, and $578.00 in cash.


 Brinkley filed
charges against Gouldsby for possession of controlled substances, with intent to deliver,
and for criminal trespass.
Â Â Â Â Â Â Â Â Â Â The next morning, Brinkley told Ross what had happened at 704 South 12th Street
and learned for the first time that the information Ross had previously given Brinkley for
that address was actually for the residence next door at 702 South 12th Street. 
Â Â Â Â Â Â Â Â Â Â Brinkley testified on cross-examination that, when he first encountered Gouldsby
that evening, he "was simply wanting to know who he was and why he was in the house." 
Brinkley said the basis of his initial contact was to detain Gouldsby to see if he was a
trespasser. Brinkley further testified, "My basis for the detention at the point of handcuffs
was the fact that Mr. Gouldsby tried to run out the back door and evade detention."
Â Â Â Â Â Â Â Â Â Â Spruill testified that, while he was at the back door at 704 South 12th Street on the
evening in question, and after Brinkley made contact with Gouldsby at the front door,
Spruill heard running footsteps coming through the house and observed Gouldsby exit the
back door. Spruill ordered Gouldsby to stop, but instead of stopping, Gouldsby started
looking for a way off the back porch. Spruill then "gave him a short burst of pepper spray"
and Gouldsby then turned and ran back inside the house. Spruill followed him into the
house, identified himself, and once again ordered Gouldsby to stop, which order Gouldsby
ignored until he again came into contact with Brinkley.
Â Â Â Â Â Â Â Â Â Â Gouldsby called two witnesses, Guillermo Arreola and Marlon Skinner, at the
hearing on his motion to suppress. Arreola testified that, on January 10, 2004, he was the
owner of the house at 704 South 12th Street, and on that date, the house was rented to
Amanda Williams and Skinner. On cross-examination, Arreola testified that, on the
occasion in question, the house was not leased to Gouldsby and that he never gave
Gouldsby permission to live in the house. He acknowledged that it was all right for his
tenants to have friends in the house, but he further testified that his tenants were the only
ones authorized to live in the house.
Â Â Â Â Â Â Â Â Â Â Skinner testified that, on January 10, 2004, he was "staying" at the residence
located at 704 South 12th Street and that he had been leasing that residence from Arreola
for two or three years. Skinner further testified that he and Gouldsby had been friends
since middle school and that Gouldsby visited him at 704 South 12th Street from time to
time. Skinner said that, on January 10, 2004, Gouldsby was at his residence with his
permission, and that, at the time the police came, Skinner had left to run an errand. 
Skinner reaffirmed he was living at that residence and disputed that it was a vacant house,
stating "we had legal water, legal electricity, cable was on, we had furniture, had bed,
stove, icebox, pots, pans." When asked on cross-examination where Gouldsby would call
home, Skinner said Gouldsby called a number of places home, including Skinner's
residence. Skinner admitted that he (Skinner) was convicted in 1999 for the felony offense
of delivery of a controlled substance, cocaine.



Â Â Â Â Â Â Â Â Â Â On rebuttal, the State introduced into evidence the "book-in sheet" for Gouldsby on
the day in question. That exhibit shows an address for Gouldsby that is different from 704
South 12th Street, Longview, Texas.
Standard of Review
Â Â Â Â Â Â Â Â Â Â At a hearing on a motion to suppress evidence, the trial court is the sole and
exclusive trier of fact and the judge of the credibility of witness testimony. Allridge v. State,
850 S.W.2d 471, 492 (Tex. Crim. App. 1991). We review the trial court's ruling on a motion
to suppress under a bifurcated standard of review, giving almost total deference to the trial
court's determination of historical facts and reviewing de novo the court's application of the
law. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). An appellate court
must uphold the trial court's ruling if it is reasonably supported by the record and is correct
under any theory of law applicable to the case. State v. Steelman, 93 S.W.3d 102, 107
(Tex. Crim. App. 2002) (citing Romero v. State, 800 S.W.2d 539, 543â44 (Tex. Crim. App.
1990)).
Standing to Contest the Search
Â Â Â Â Â Â Â Â Â Â Citing Rawlings v. Kentucky, 448 U.S. 98, 104â05 (1980), the State contends
Gouldsby had no legitimate expectation of privacy in the home at 704 South 12th Street
and, therefore, had no standing to contest the search and seizure. Whether a defendant
has standing to contest a search and seizure is a question of law reviewed de novo. 
Parker v. State, 182 S.W.3d 923, 925 (Tex. Crim. App. 2006).
Â Â Â Â Â Â Â Â Â Â Gouldsby's only argument that he did have standing is that, "[a]s a legally invited
guest on the premises at almost midnight, he comes within the ambit of Minnesota v.
Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)." In Olson, the Supreme Court
held that Olson, as an overnight guest in an upstairs duplex, had a reasonable expectation
of privacy in the premises which was protected by the Fourth Amendment and, thus, had
standing to challenge his warrantless arrest. 
Â Â Â Â Â Â Â Â Â Â The facts of the instant case are far different from those in Olson. While Skinner
testified that Gouldsby frequently stayed with him at 704 South 12th Street, he,
significantly, did not testify that Gouldsby was an overnight guest the night of January 10,
2004. Also, Skinner agreed that he sometimes permitted Gouldsby to stay at that address 
briefly while he (Skinner) ran an errand, and that, when the police came that night, he
(Skinner) had gone to run an errand. Gouldsby's reliance on Minnesota v. Olson is
misplaced. See Taylor v. State, 995 S.W.2d 279, 282 (Tex. App.âTexarkana 1999, pet.
dism'd). Further, Gouldsby relies entirely on Skinner's testimony to establish standing and
the trial court specifically found such testimony "insufficient to convince the Court of the
truth of the assertions contained therein."
Â Â Â Â Â Â Â Â Â Â We agree the record fails to show that Gouldsby had standing to contest the search
and seizure. We will, however, address his other contentions, in the interest of justice. 
Lawful Arrest
Â Â Â Â Â Â Â Â Â Â Inasmuch as the search and seizure in this case was really one incident to arrest,
the proper focus is on whether Gouldsby was lawfully arrested. If his arrest was lawful,
then the seizure of the evidence incident to that arrest was also lawful. See Minnesota v.
Dickerson, 508 U.S. 366, 372 (1993) (search incident to arrest among exceptions to
general rule that a warrantless search of either person or property per se unreasonable
under Fourth Amendment); see also McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim.
App. 2003). 
Â Â Â Â Â Â Â Â Â Â Gouldsby's argument that his arrest was unlawful is based on three primary
contentions: 1) the police had no reasonable basis to temporarily detain him; 2) the police
entry into the home violated Article 15.25, Texas Code of Criminal Procedure; and 3) there
were no "exigent circumstances" justifying entry into the house by the police.
Â Â Â Â Â Â Â Â Â Â Reasonable Basis to Detain
Â Â Â Â Â Â Â Â Â Â An investigative detention is permitted under the Fourth Amendment if it is
supported by reasonable suspicion. Terry v. Ohio, 392 U.S. 1, 27 (1968). Reasonable
suspicion is a particularized and objective basis for suspecting the person detained is, has
been, or soon will be engaged in criminal activity. Crockett v. State, 803 S.W.2d 308, 311
(Tex. Crim. App. 1991). An officer's reasonable suspicion must be based on objective
facts that the individual is involved in criminal activity. Dickey v. State, 716 S.W.2d 499,
503 n.4 (Tex. Crim. App. 1986). These objective facts can be formed on the basis of an
officer's training and experience, the officer's belief that a crime is, has been, or soon will
be committed, and whether the person detained is in a "high crime area." See Illinois v.
Wardlow, 528 U.S. 119, 123 (2000) (high crime area); United States v. Cortez, 449 U.S.
411, 418 (1981); Dickey, 716 S.W.2d at 503 n.4 (training and experience); Woods v. State,
956 S.W.2d 33, 38 (Tex. Crim. App. 1997) (person detained is, has been, or soon will be
engaged in criminal activity).
Â Â Â Â Â Â Â Â Â Â There are two bases on which the police had reasonable suspicion to effect an
investigative detention of Gouldsby. First, Brinkley had observed marihuana residue and
drug paraphernalia in plain view inside this house the previous evening. Brinkley's entry
into that house at 2:30 a.m. on that occasion was reasonable because: 1) the front door
was standing open;


 2) he reasonably believed the house was vacant; and 3) because the
house was located in a high crime area, he reasonably believed criminal activity might be
taking place there. Based on his observations inside the house, and based on his training
and experience, Brinkley concluded the house was "a cut house where narcotics are cut
up to be sold on the street." When Brinkley then observed two individuals standing on the
front porch of this house late the following evening, he reasonably suspected they were
connected to the drug activity he had observed inside the house the previous evening. He
therefore was authorized, under Terry, to make an investigative detention of these two
individuals. 
Â Â Â Â Â Â Â Â Â Â Second, Brinkley was also authorized, under Terry, to make an investigative
detention of these two individuals as suspected trespassers. Brinkley had been told by
Ross, the day-shift officer, that the owner of the house would file trespassing charges
against anyone caught on the property. That this information turned out to pertain to the
property next door does not undermine Brinkley's good-faith belief at the time he sought
to speak to the persons he saw standing on the front porch.
Â Â Â Â Â Â Â Â Â Â Brinkley, in an effort to effect his lawful investigative detention, made contact with
Gouldsby at the front door. Gouldsby sought to avoid the detention by fleeing to the back
of the house where Spruill also attempted to detain him. Gouldsby again fled back inside
the house. By so fleeing from the officers, Gouldsby was subject to being arrested, without
a warrant, for the offense of evading detention,


 committed in the presence of the officers. 
See Tex. Code Crim. Proc. Ann. art. 14.01(b) (Vernon 2005). As the officers were
effecting such an arrest, Gouldsby removed from his pockets what Brinkley recognized as
illegal narcotics. Such act by Gouldsby was the commission of yet another
offenseâpossession of a controlled substanceâin the presence of the officers, for which
such officers had probable cause to arrest. The controlled substances Gouldsby sought
to have suppressed at his trial were lawfully seized, incident to his arrest for these
offenses. 
Â Â Â Â Â Â Â Â Â Â Article 15.25 Violation
Â Â Â Â Â Â Â Â Â Â Article 15.25 of the Texas Code of Criminal Procedure provides as follows:
In case of felony, the officer may break down the door of any house for the
purpose of making an arrest, if he be refused admittance after giving notice
of his authority and purpose.

Tex. Code Crim. Proc. Ann. art. 15.25 (Vernon 2005).

Â Â Â Â Â Â Â Â Â Â Gouldsby contends that, because neither criminal trespass nor evading detention
constitutes a felony, Brinkley gained entry into the house January 10 in violation of this
article. He therefore argues that, pursuant to Article 38.23(a) of the Texas Code of
Criminal Procedure, prohibiting the admission of evidence found in violation of law, the
drugs seized on the occasion in question should have been suppressed.
Â Â Â Â Â Â Â Â Â Â First, there is no evidence Brinkley broke down the door. His testimony was that it
was only after Gouldsby had agreed to talk to him, but then shut the peephole door, pulled
out the doorknob, and started running away that Brinkley then pushed the door open with
his shoulder.
Â Â Â Â Â Â Â Â Â Â Even if Brinkley's pushing the door open with his shoulder could be construed as 
breaking down the door, Gouldsby's argument ignores Spruill's testimony that he observed
Gouldsby exit the back door and then run back into the house, and that Spruill then
followed him inside the house. Spruill was the one who placed handcuffs on Gouldsby,
and there is no evidence he used any force to gain entry into the house.
Â Â Â Â Â Â Â Â Â Â Exigent Circumstances
Â Â Â Â Â Â Â Â Â Â An officer making an arrest without a warrant may not enter a residence to make the
arrest unless a person who resides in the residence consents to the entry, or exigent
circumstances require that the officer making the arrest enter the residence without the
consent of a resident or without a warrant. Tex. Code Crim. Proc. Ann. art. 14.05 (Vernon
2005). Gouldsby contends there were no exigent circumstances justifying the officers'
entry into the house where he was arrested January 10. 
Â Â Â Â Â Â Â Â Â Â In order to support a warrantless search, probable cause, in combination with some
sort of exigent circumstances, must exist. Estrada v. State, 154 S.W.3d 604, 609 (Tex.
Crim. App. 2005). "Probable cause to search exists when reasonably trustworthy facts and
circumstances within the knowledge of the officer on the scene would lead a [person] of
reasonable prudence to believe that the instrumentality of a crime or evidence of a crime
will be found." McNairy v. State, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991).
Â Â Â Â Â Â Â Â Â Â Exigent circumstances are those which justify an immediate need to enter a
residence without first obtaining a search warrant. Parker v. State, No. PD-0250- 05, 2006
Tex. Crim. App. LEXIS 759, at *8 (Tex. Crim. App. Apr. 12, 2006). A variety of such
circumstances may place a police officer in situations in which a warrantless entry is
viewed as a reasonable reaction by the officer. Situations creating exigent circumstances
usually include factors pointing to some danger to the officer or victims, an increased
likelihood of apprehending a suspect, or the possible destruction of evidence. McNairy,
835 S.W.2d at 107.
Â Â Â Â Â Â Â Â Â Â The Texas Court of Criminal Appeals has recently stated that the determination of
whether an officer has probable cause and exigent circumstances is a factual one based
on the sum of all the information known to the officer at the time of entry. Parker, 2006
Tex. Crim. App. LEXIS 759, at *12. The officers in this case had probable cause to believe
Gouldsby was committing, in their presence, the offense of evading detention when, after
agreeing with Brinkley to open the door, he shut the peephole door, removed the doorknob
from the bigger door, ran to the back and out of the house, ignored Spruill's order to stop,
and retreated back inside the house. These circumstances, together with Brinkley's
knowledge of the marihuana residue and drug paraphernalia he had observed inside that
house the evening before, which information he had previously communicated to Spruill,
would have led the officers to believe the instrumentality of a crime or evidence of a crime
would be found inside the house and made a warrantless entry a reasonable reaction. 
Further, because Brinkley had been told by another officer that the owner of the house
would file trespassing charges against anyone caught on the property, this
informationâalbeit mistaken information at the time it was communicatedâcreated in
Brinkley's mind an increased likelihood of apprehending a trespasser. 
Â Â Â Â Â Â Â Â Â Â Based on the sum of all the information known to the officers at the time of entry,
they had probable cause and sufficient exigent circumstances to justify their entry into the
house. Gouldsby's contention to the contrary is overruled.
Conclusion
Â Â Â Â Â Â Â Â Â Â Gouldsby had no standing to contest the search and seizure. Even so, the officers
had a reasonable basis to temporarily detain Gouldsby, and ultimately, probable cause to
arrest him. The evidence he sought to suppress was seized incident to a lawful arrest. 
The officers' entry into the house was not a violation of Article 15.25 of the Texas Code of
Criminal Procedure. There were exigent circumstances which justified the officers' entry
into the house. For all these reasons, we conclude the trial court did not err in denying
Gouldsby's motion to suppress.
Â Â Â Â Â Â Â Â Â Â We affirm the judgment.


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice 
Â 
Date Submitted:Â Â Â Â Â Â June 6, 2006
Date Decided:Â Â Â Â Â Â Â Â Â August 3, 2006

Publish



:justify;text-justify:inter-ideograph;
line-height:200%;mso-pagination:widow-orphan'>   In
a frivolous appeal situation, we are to determine whether the appeal is without
merit and is frivolous, and if so, the appeal must be dismissed or
affirmed.Â  See Anders, 386 U.S. 738.Â Â  We
affirm the judgment of the trial court.[2]

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Jack
Carter

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  August
12, 2010

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  August
13, 2010

Â 

Do Not Publish

Â 

Â 

Â 











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.Â  See Tex. GovÂt Code Ann.
Â§ 73.001 (Vernon 2005).Â  

Â 





[2]Since
we agree this case presents no reversible error, we also, in accordance with Anders, grant counselÂs request to
withdraw from further representation of Shelton in this case.Â  No substitute counsel will be appointed.Â  Should Shelton wish to seek further review of
this case by the Texas Court of Criminal Appeals, Shelton must either retain an
attorney to file a petition for discretionary review or Shelton must file a pro
se petition for discretionary review.Â 
Any petition for discretionary review must be filed within thirty days
from the date of either this opinion or the last timely motion for rehearing
that was overruled by this Court.Â  See Tex.
R. App. P. 68.2.Â  Any petition for
discretionary review must be filed with this Court, after which it will be
forwarded to the Texas Court of Criminal Appeals along with the rest of the
filings in this case.Â  See Tex.
R. App. P. 68.3.Â  Any petition for
discretionary review should comply with the requirements of Rule 68.4 of the
Texas Rules of Appellate Procedure.Â  See Tex.
R. App. P. 68.4.