Filed 1/6/15  P. v. Ulloa CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.  !

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO LUIS ULLOA,<br><br>Defendant and Appellant. | D065341<br><br><br>(Super. Ct. No. SCD244857) |

APPEAL from an order of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Reversed and remanded.

Earll M. Pott and Loleena Ansari, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

In December 2011, the Drug Enforcement Agency (DEA) learned a drug-trafficking organization, the Knights Templar, planned to drive a shipment of narcotics

from Mexico to the United States. Intelligence established a Spanish-speaking man would receive the shipment at a specified residence in Santa Ana, California. Local law enforcement agreed to help with surveillance and monitoring. On arrival at the residence, detectives noticed two Hispanic men, including defendant, milling about a vehicle backed into the driveway of the residence with its doors, hood, and trunk open.

Soon thereafter, a third man, Jose Hurtado-Ponce, emerged from the garage, walked across the street, and peered inside a surveillance van. When Hurtado-Ponce returned to the driveway, the other men stopped what they were doing and closed the vehicle. One man drove the vehicle away while Hurtado-Ponce and Ulloa went back into the home. Without a warrant, and without consent, the detectives approached and promptly entered the home, where they found Ulloa carrying a satchel containing narcotics and cash. It was later discovered the vehicle also contained narcotics.

In December 2012, the San Diego County District Attorney's Office charged Ulloa with six counts related to his possession of cocaine, heroin, and methamphetamine. In May 2013, Ulloa filed a motion to suppress evidence, pursuant to Penal Code section 1538.5, claiming the warrantless search of his home violated his Fourth Amendment rights. The People filed an opposition, arguing exigent circumstances justified the search. In October 2013, the motion was heard and denied. In December 2013, Ulloa renewed his motion. When it was again denied, Ulloa pleaded guilty to all charges, preserving his right to appeal the denial of his section 1538.5 motion.

FACTUAL AND PROCEDURAL BACKGROUND

In 2011, the DEA investigated a Mexican drug-trafficking organization known as the Knights Templar. As part of the investigation, the DEA arranged for several wiretaps on the phones of the organization's lead members. On December 27, 2011, the DEA intercepted approximately seven calls involving organization leader Jose Antioco Padilla (Tioco) and suspected drug couriers, including one call to a man later identified as Ulloa. These calls revealed the organization planned to drive a shipment of narcotics across the United States-Mexico border, and to deliver that shipment to Ulloa.

The next morning, agents intercepted another call between Tioco and Ulloa, during which Ulloa agreed to wait at his then-current location until contacted by the load driver. From this call, agents used Global Positioning System (GPS) satellite pings to determine that Ulloa would receive the shipment at a specific residence in Santa Ana (residence). The DEA called the California Multi-jurisdictional Methamphetamine Enforcement Team (Cal-MMET), a special task force of the Los Angeles Sheriff's Department, to request assistance with surveillance and monitoring. DEA agent Nathan Jones told Cal-MMET detective Laurence Zimmerman that, based on wiretap information, the DEA expected a vehicle to deliver a shipment of narcotics to a man at the residence. Jones did not describe the suspected vehicle or any suspected persons at that time, but he believed Zimmerman inferred the man spoke Spanish, as their investigation plainly involved Spanish-speaking individuals.

Zimmerman and other Cal-MMET detectives parked across the street from the residence, and began surveillance of the area. They noticed two Hispanic men, including

3

Ulloa, milling about a vehicle, a silver Lincoln LS, backed into the driveway with its doors, hood, and trunk open. Soon thereafter, a third man, Hurtado-Ponce, emerged from the garage, walked across the street, and tried to peer inside a Cal-MMET surveillance van. The record does not indicate what Hurtado-Ponce saw, or might have seen, inside the van. When Hurtado-Ponce returned to the driveway, he and the other two men had a brief conversation, and the other men immediately stopped what they were doing and closed up the vehicle. One man drove the vehicle away as Hurtado-Ponce and Ulloa retreated into the home. Believing Hurtado-Ponce had compromised the surveillance, but unsure of whether the men had already unloaded narcotics into the home, Zimmerman decided to approach the residence to conduct a consent search.

Zimmerman directed the detectives to suit up and otherwise prepare for entry, a process that took approximately 15 minutes. The Cal-MMET team then approached the residence. They encountered a few individuals in the driveway, including women and children, but neither sought nor obtained their consent to search the home. Through an open door, Zimmerman saw Hurtado-Ponce and directed him outside. Hurtado-Ponce immediately complied. Another detective, positioned around the back of the residence, communicated that he saw Ulloa inside. Zimmerman ordered a "protective sweep" of the residence. They found Ulloa running through the family room toward the back door. The detectives promptly detained him and seized and searched his satchel, which contained six ounces of cocaine, one ounce of methamphetamine, and $6,000 in cash. A search of Ulloa's person yielded a cell phone, the same one used during the intercepted phone calls, and an additional $1,400 in cash.

4

The detectives later discovered the Lincoln LS in a parking lot a few miles away. A search of the vehicle produced roughly one pound of cocaine, six pounds of heroin, and 11 pounds of methamphetamine.

In December 2012, the San Diego County District Attorney's Office charged Ulloa with possession of cocaine, heroin, and methamphetamine. The court subsequently denied Ulloa's motions to suppress under Penal Code section 1538.5, ruling in both instances the search of the residence was warranted as an exception to the Fourth Amendment. Ulloa appeals the denial of his section 1538.5 motion.

DISCUSSION

I

*Standard of Review*

"An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles." (*People v. Williams* (1988) 45 Cal.3d 1268, 1301.) As a mixed question of law and fact, two standards apply: the appellate court defers to the trial court's factual findings when supported by substantial evidence, but reviews de novo the issue of whether the challenged search was reasonable under the Fourth Amendment. (*People v. Alvarez* (1996) 14 Cal.4th 155, 182; *People v. Leyba* (1981) 29 Cal.3d 591, 595-597.)

II

*Warrantless Entry of a Residence*

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

5

unreasonable searches and seizures," and generally precludes warrantless entry into a home.  (U.S. Const., 4th Amend.; *People v. Henderson* (1990) 220 Cal.App.3d 1632, 1649 [explaining that "courts have guarded with particular zeal the right of individuals to carry on private activities within their homes without unreasonable governmental intrusion"].)  "It is not surprising, therefore, that the Court has recognized, as 'a "basic principle of Fourth Amendment law[,]" that searches and seizures inside a home without a warrant are presumptively unreasonable.' "  (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748-749, quoting *Payton v. New York* (1980) 445 U.S. 573, 586.)

The presumption of unreasonableness may be overcome, however, by a showing of exigent circumstances.  (*Minnesota v. Olson* (1990) 495 U.S. 91, 100 (*Olson*).) "Exigent circumstances are defined as 'those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' "  (*U.S. v. Lindsey* (9th Cir. 1989) 877 F.2d 777, 780-781, quoting *U.S. v. McConney* (9th Cir. 1984) 728 F.2d 1195, 1199 (en banc), cert. den. (1984) 469 U.S. 824.)

The People here claim exigent circumstances, namely the imminent destruction of relevant evidence and the imminent escape of the suspect, justified the warrantless entry. The People's burden is thus twofold: "First, it must demonstrate probable cause to secure [the] residence.  Second, it must show the existence of exigent circumstances to excuse the lack of a warrant."  (*U.S. v. Lindsey*, *supra*, 877 F.2d at p. 780.)

A. *The Imminent Destruction of Relevant Evidence*

1. *Probable Cause as to the Presence of Contraband*

To demonstrate probable cause to enter the residence, the People must demonstrate there was probable cause to believe contraband or other evidence was present in the residence. (See *People v. Celis* (2004) 33 Cal.4th 667, 676 (*Celis*) [recognizing the imminent destruction of evidence exception applies when officers have probable cause to believe evidence of a crime is present in the home, and reasonably conclude the evidence will be destroyed or removed before they can secure a warrant].) Probable cause is a factually specific, "fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." (*Illinois v. Gates* (1983) 462 U.S. 213, 232.) Instead, it requires "a fair probability that contraband or other evidence of a crime will be found in a particular place," based on the totality of the circumstances. (*Id.* at p. 238.)

The People admit the Cal-MMET detectives had no idea whether the suspected contraband was in the residence, in the vehicle, both, or neither. The detectives thus inferred the presence of contraband based on their understanding of the wiretap information; the GPS cell phone ping to the residence; the presence in the driveway of that residence of a vehicle, surrounded by a few Hispanic men, with its doors, hood, and trunk open; and the conceivably suspicious behavior that occurred following Hurtado-Ponce's "counter-surveillance."

Ulloa contends the detectives had only limited information not amounting to probable cause as to the presence of contraband in the residence. When DEA agent Jones asked detectives to assist with surveillance and monitoring, he did not provide a

7

description of either the suspected vehicle or any suspected persons. Because the vehicle was already present when the detectives arrived at the residence, they had no insight as to how long it been there, or what had happened since it arrived. Zimmerman testified the detectives saw nothing removed from the vehicle or carried into the residence—no actual narcotics, no suspicious packages, weapons, or other contraband. After Hurtado-Ponce peered inside the surveillance van, he walked to the house before the three men closed up the vehicle and dispersed, leaving both the front and garage doors wide open.

The People assert, however, the detectives nonetheless had information amounting to probable cause based on the totality of the circumstances. The detectives easily verified the information relayed by Jones as soon as they arrived at the scene. The detectives then analyzed the event, as it unfolded, in light of their experience and training in narcotics and trafficking. " 'Circumstances and conduct which would not excite the suspicion of the man on the street might be highly significant to an officer who had had extensive training and experience in the devious and cunning devices used by narcotics offenders to conceal their crimes.' " (*People v. Johnson* (1971) 21 Cal.App.3d 235, 244, quoting *People v. Williams* (1961) 196 Cal.App.2d 726, 728.)

Moreover, Zimmerman testified that based on his experience and training, he believed the vehicle's open doors, hood, and trunk were consistent with and indicative of narcotics trafficking. The trial court agreed, finding the vehicle was "not . . . parked in a regular way [for] a residential home." Zimmerman also testified that based on his expert opinion, the suspects acted "covertly," not calmly, in reaction to Hurtado-Ponce's countersurveillance. The trial court again agreed, finding the suspects reacted "not in a

8

relaxed way, not in a slow way, not [in] an ordinary way, but consistent with a way that would raise a suspicion."

Although probable cause is a concept not readily reduced to a neat set of legal rules, the detectives acted on a collection of information that, when examined in its entirety, sufficiently established the existence of narcotics in one of two places: the home or the vehicle. We therefore conclude on this record that the detectives had probable cause to believe there was contraband in the home.

## 2. *Probable Cause as to the Existence of Exigent Circumstances*

To demonstrate the existence of exigent circumstances, the People must demonstrate there was probable cause that the destruction of evidence was imminent; that exigent circumstances called for "police action literally . . . 'now or never' to preserve the evidence of the crime." (*Roaden v. Kentucky* (1973) 413 U.S. 496, 505; *Celis*, *supra*, 33 Cal.4th at p. 676; *Olson*, *supra*, 495 U.S. at p. 100.) Where exigency is based on the imminent destruction of evidence, courts have found relevant " '(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic." ' " (*People v. Koch* (1989) 209 Cal.App.3d 770, 782 (*Koch*), quoting *U.S. v. Rubin* (3d Cir.1973) 474 F.2d 262, 268-269; *People v. Ortiz* (1995) 32 Cal.App.4th 286,

9

292 (*Ortiz*).) " ' " '[F]ear or apprehension alone that evidence will be destroyed will not justify a warrantless entry of a private home.' " ' " (*People v. Thompson* (2006) 38 Cal.4th 811, 835, quoting *People v. Gentry* (1992) 7 Cal.App.4th 1255, 1262.)

The court ultimately decides whether exigency justified the warrantless entry by "the totality of circumstances known to the officers at the time of the warrantless intrusion." (*Hopkins v. City of Sierra Vista, Ariz.* (9th Cir. 1991) 931 F.2d 524, 527.)

In *Ortiz*, two police officers entered a hotel looking for a man they saw drinking outside. (*Ortiz, supra*, 32 Cal.App.4th at p. 289.) As they walked down the hallway, the officers noticed a room door left ajar and, inside, a woman three to six feet away counting tinfoil bindles and placing them on a table near the bed. (*Id.* at pp. 289-290.) Suspecting the tinfoil contained heroin possessed for sale, the officers pushed open the door and walked into the room. (*Id.* at p. 290.) The court decided "the specific facts known to [the officers] and the inferences reasonably drawn therefrom support[ed] a finding of exigent circumstances." (*Id.* at p. 295.) In light of the factors listed above, we find this record to be distinguishable from *Ortiz*.

The first factor considers the degree of urgency involved and the amount of time necessary to obtain a warrant. (*Koch, supra*, 209 Cal.App.3d at p. 782.) In *Ortiz*, the officers " 'observed criminal activity with the naked eye from a vantage point accessible to the general public.' " (*Ortiz, supra*, 32 Cal.App.4th at p. 291, quoting *U.S. v. Garcia* (9th Cir. 1993) 997 F.2d 1273, 1279.) Believing the woman might be engaged in some sort of fleeting drug transaction, in which the purchaser or seller was about to leave the room, the officers believed, and the court agreed, that leaving to obtain a warrant would

10

require longer than the few minutes in which such a transaction could have been consummated. (*Ortiz*, at pp. 293-294.)

Here, unlike the officers in *Ortiz*, the detectives did not directly observe criminal activity. In fact, the detectives saw nothing removed from the vehicle or carried into the residence—no actual narcotics, no suspicious packages, weapons, or other contraband. And, unlike the officers in *Ortiz*, the detectives did not believe the suspects were engaged in a *fleeting* drug transaction. Instead, they understood that the transaction involved a sizeable shipment from Mexico. Although obtaining a warrant "would have taken at minimum two to three hours," unlike the two officers in *Ortiz*, the Cal-MMET team could have sent one of the many detectives on scene without jeopardizing their entire operation. The People do not suggest facts or circumstances tending to suggest particular urgency.

The second factor considers the reasonable belief that contraband is about to be removed. (*Koch*, *supra*, 209 Cal.App.3d at p. 782.) In *Ortiz*, the officers believed if they did not take immediate action the contraband would be destroyed. (*Ortiz*, *supra*, 32 Cal.App.4th at p. 290.) Specifically, "[w]hen asked how the heroin might be destroyed 'within the confines of that room,' [the officer] said he was concerned the culprits might swallow it." (*Id.* at p. 290, fn. 1.) This fear was based in part on the "common knowledge that those who possess drugs often attempt to destroy the evidence when they are observed by law enforcement officers." (*Id.* at p. 293.)

Here, unlike the officers in *Ortiz*, the detectives acted without express concern any drugs would be destroyed or removed. Specifically, when asked about whether the

11

detectives were concerned about the destruction of evidence, Zimmerman said nothing more than "destruction of evidence is always a possibility." Moreover, a detective positioned around the back of the residence could see Ulloa inside, and thus presumably could also see whether Ulloa was attempting to destroy evidence. The record includes no such observation. Instead, the record suggests the detectives walked right in, based only on Zimmerman's concerns, which simply " ' " 'will not justify a warrantless entry of a private home.' " ' " (*People v. Thompson*, *supra*, 38 Cal.4th at p. 835.)

The third factor considers the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought. (*Koch*, *supra*, 209 Cal.App.3d at p. 782.) In *Ortiz*, with only two officers present, if one officer left in search of a warrant the other would be alone, charged with preventing the destruction of evidence and arresting any suspects, without knowing how many others might be inside, and without knowing whether any suspect was armed. (*Ortiz*, *supra*, 32 Cal.App.4th at p. 294.)

Here, unlike in *Ortiz*, there were many detectives present at the time they approached the residence. If one left in search of a warrant, there still would have been many officers guarding the site of the contraband without increasing the possibility of danger. Moreover, during the 15 minutes between Hurtado-Ponce's countersurveillance and the detectives' approach, the front and garage doors remained open, people continued to wander about, both inside the residence and in the driveway, including women and children, and no one attempted to leave. As the detectives approached the residence, Hurtado-Ponce remained in plain view and quickly complied with Zimmerman's request to come outside. Although these circumstances do not completely alleviate the

12

possibility of danger to detectives on scene, especially considering the belief that "narcotics dealers are frequently armed," the familial atmosphere and Hurtado-Ponce's ready compliance together diminish that possibility. (*U.S. v. Cattouse* (2d Cir. 1988) 846 F.2d 144, 146.)

The fourth factor considers information indicating the possessors of the contraband are aware the police are on their trail. (*Koch*, *supra*, 209 Cal.App.3d at p. 782.) *Ortiz* explains the officers need not be certain they were actually seen; "[i]t is sufficient the officers were presented with specific circumstances from which it reasonably may be inferred that [the suspects] had, or might have, detected their presence." (*Ortiz*, *supra*, 32 Cal.App.4th at p. 293.)

Here, the detectives believed Hurtado-Ponce compromised their watch when he tried to peer into the surveillance van parked across the street from the residence. They based this belief on the fact that immediately afterward, the three men closed up the vehicle and dispersed. This behavior was "consistent with a way that would raise a suspicion."

The fifth factor considers the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics are characteristic of persons engaged in narcotics trafficking. (*Koch*, *supra*, 209 Cal.App.3d at p. 782.) In *Ortiz*, the officers believed the contraband sitting in front of the woman was readily destructible, "[s]ince it is common knowledge that those who possess drugs often attempt to destroy the evidence when they are observed by law enforcement officers." (*Ortiz*, *supra*, 32 Cal.App.4th at p. 293.)

13

Here, unlike in *Ortiz*, the detectives suspected the residence contained an entire shipment of drugs. Although the detectives did not know exactly how many pounds of what kind of drugs they might discover therein, it is reasonable to infer that the shipment was not of a readily destructible amount.

The detectives apparently jumped the gun. They could have ordered Ulloa out, as they ordered Hurtado-Ponce, or they could have waited a moment longer to apprehend Ulloa as he left the residence through the sliding glass door. Instead, they entered the residence without hesitation, without a warrant, and without specific and articulable facts amounting to probable cause to justify the invasion. Here, "[n]o reason is offered for not obtaining a search warrant except the inconvenience . . . and some slight delay . . . . These are never very convincing reasons and, in these circumstances, certainly are not enough to bypass the constitutional requirement." (*Johnson v. U.S.* (1948) 333 U.S. 10, 15.)

Unlike the officers in *Ortiz*, the detectives were not "presented with an unexpected situation which required a quick assessment." (*Ortiz*, *supra*, 32 Cal.App.4th at p. 294.) They were not "out in the field," they were participating in a " 'planned arrest' resulting from an investigation." (*Ibid.*) We conclude the People have not established probable cause the destruction of evidence was imminent.

B. *The Imminent Escape of the Suspect*

The People alternatively contend the imminent escape of the suspect justified the warrantless search of the residence. Although the trial court did not address this

14

argument, we conclude it does not justify the warrantless search because the detectives did not have probable cause to believe Ulloa might escape.

In *Olson*, police suspected the defendant had driven the getaway vehicle during a robbery turned fatal shooting. (*Olson*, *supra*, 495 U.S. at p. 93.) After tracking him to the residence at which he was an overnight guest, police surrounded the home before calling to ask the defendant to come outside. (*Id.* at p. 94.) The defendant refused and, 15 minutes later, police made a warrantless, nonconsensual entry and found the defendant hiding in a closet. (*Ibid.*) Although the Supreme Court recognized "a warrantless intrusion may be justified by hot pursuit of a fleeing felon" (*id.* at p. 100), it determined the requisite exigent circumstances did not exist because " '[i]t was evident the suspect was going nowhere. If he came out of the house he would have been promptly apprehended.' " (*Id.* at p. 101.)

Here, like *Olson*, it was evident Ulloa was going nowhere. The detectives were stationed around the exterior of the residence, including at the back entrance, and had Ulloa emerged he would have been promptly apprehended. We conclude exigent circumstances did not exist to justify the warrantless search of the residence. The dissenting opinion's somewhat intemperate response to our conclusion does not persuade us to change our conclusion.

### III

### *Protective Sweep*

The People alternatively contend reasonable suspicion justified the warrantless entry as a protective sweep. "A 'protective sweep' is a quick and limited search of

15

premises, incident to an arrest and conducted to protect the safety of police officers or others." (*Maryland v. Buie* (1990) 494 U.S. 325, 327 (*Buie*).) Such a search is permitted "in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Id.* at p. 337.)

Zimmerman ordered a protective sweep after directing Hurtado-Ponce outside. The detectives engaged in the sweep not in conjunction with an in-home arrest but amidst an out-of-home detention. However, "[a] protective sweep is not limited to situations immediately following an arrest . . . [and] may occur in conjunction with a suspect's detention." (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1206 (*Werner*), citing *Celis, supra,* 33 Cal.4th at p. 679.) Entry incident to an arrest or detention conducted *outside* the home may be permissible when the "arrest taking place just outside . . . pose[s] an equally serious threat to the arresting officers" as one that occurs in the home. (*U.S. v. Colbert* (6th Cir. 1996) 76 F.3d 773, 776; *Celis*, at p. 679.) That the detectives merely detained Hurtado-Ponce just outside the home therefore does not preclude them from conducting a protective sweep of the residence.

Nonetheless, the People must establish that reasonable suspicion supported the protective sweep. (*Werner*, *supra*, 207 Cal.App.4th at p. 1206.) Reasonable suspicion is an abstract concept based on the totality of the circumstances, and calls for "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." (*Buie*, *supra*, 494 U.S. at p. 334.) The test

16

for a protective sweep thus "requires a reasonable suspicion *both* that another person is in the premises *and* that that person is dangerous." (*Werner*, *supra*, 207 Cal.App.4th at p. 1206.)

The People assert reasonable suspicion supported the protective sweep. The detectives knew with some certainty someone remained inside the residence. Following Hurtado-Ponce's surveillance, the detectives watched both Ulloa and Hurtado-Ponce retreat into the residence. Zimmerman ordered the protective sweep, after directing Hurtado-Ponce outside and before Ulloa had yet emerged, when a detective positioned around the back announced he saw someone inside. The pivotal issue is, therefore, whether articulable facts warranted the detectives' belief Ulloa posed a danger to those at the scene. We conclude they did not.

The People admit the detectives observed neither narcotics nor weapons prior to the protective sweep. Nonetheless, the People argue, based on the nature of narcotics transactions and the fact the detectives "could not see [Ulloa] and could not know where he was inside the home or what he was doing," a reasonably prudent officer would have believed Ulloa posed a danger to those at the scene. But a detective positioned around the back of the residence saw Ulloa inside, and thus presumably could also see whether Ulloa was taking up arms or engaging in other threatening behavior. The record includes no such observation. The People further assert Ulloa "was not responding to commands to exit the [home]." But Zimmerman testified he only ordered Hurtado-Ponce out, because "[n]obody else was [visible]."

17

The People nonetheless claim these facts do not rule out the possibility of danger to the officers, especially considering Zimmerman's many years of experience as a sworn peace officer and a member of the narcotics task force. Our consideration of the totality of the circumstances certainly includes "consideration of the modes or patterns of operation of certain kinds of lawbreakers." (*U.S. v. Cortez* (1981) 449 U.S. 411, 418.) "Society's interest in protecting police officers must, however, be balanced against the constitutionally protected interest of citizens to be free of unreasonable searches and seizures." (*Celis*, *supra*, 33 Cal.4th at p. 680.)

In *Celis*, police suspected the defendant was involved in drug trafficking. (*Celis*, *supra*, 33 Cal.4th at p. 671.) During surveillance of his home, police witnessed the defendant rolling a large, inflated truck tire toward an alley. (*Id.* at p. 672.) Believing the tire contained either money or narcotics, the officers detained the defendant outside and thereafter conducted a protective sweep of his home, because they "noticed [the] defendant's wife and 'possibly a male juvenile' lived with him." (*Ibid.*) The Supreme Court found "[t]he facts known to the officers before they performed the protective sweep fell short of what *Buie* requires . . . ." (*Id.* at pp. 679, citing *Buie*, *supra*, 494 U.S. at pp. 327, 334.) The court emphasized that the officers had not been keeping track of who was in the house, and had no indication the defendant was armed. (*Celis*, at p. 679.)

Here, like *Celis*, the facts known to the detectives before they performed the protective sweep fall short of *Buie's* requirements. The detectives knew Ulloa was inside, but they had no indication he was armed or otherwise dangerous. The People have not pointed to specific and articulable facts that would warrant a reasonably prudent officer

18

to entertain a reasonable suspicion that Ulloa posed a danger to officer safety.  Like the court in *Celis*, we recognize that "the work of a police officer in the field is often fraught with danger."  (*Celis*, *supra*, 33 Cal.4th. at p. 680.)  But, like the court in *Celis*, we conclude that the usual dangers associated with drug trafficking are not sufficient on their own to justify a warrantless entry.  "[A] protective sweep may not be based on 'a mere "inchoate and unparticularized suspicion or 'hunch . . . .' " ' " (*Id.* at p. 678.)

## DISPOSITION

The order denying the motion is reversed.  The matter is remanded to the trial court to set aside Ulloa's guilty plea and vacate the order denying his motion to suppress evidence.


McDONALD, Acting P. J.

I CONCUR:

McINTYRE, J.

19

Aaron, J., concurring and dissenting:

I concur with the majority's conclusion that there was probable cause to believe there was contraband in the home. However, I dissent from part II.A.2. of the majority opinion because I believe that exigent circumstances justified the warrantless entry and search of the home. I would therefore affirm the judgment of the trial court denying Ulloa's motion to suppress.

Exigent circumstances sufficient to justify a warrantless entry into a home exist when there is "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (*People v. Ramey* (1976) 16 Cal.3d 263, 276; *Welsh v. Wisconsin* (1984) 466 U.S. 740, 748-753.) As the majority notes, courts look to " ' "the totality of the circumstances known to the officers at the time of the warrantless intrusion" ' " (quoting *Hopkins v. City of Sierra Vista*, Ariz. (9th Cir. 1991) 931 F.2d 524, 527), to determine whether exigent circumstances exist. (*United States v. Licata* (9th Cir. 1985) 761 F.2d 537.) Further, "[i]n determining whether a law enforcement officer acted reasonably [under the circumstances], due weight must be given . . . to *the reasonable inferences which he is entitled to draw from the facts in the light of his experience . . . .*" (*People v. Duncan* (1986) 42 Cal.3d 91, 98, italics added.)

In *People v. Ortiz* (1995) 32 Cal.App.4th 286, two police officers, Forsythe and Vila, entered a hotel looking for a man they had seen drinking in front of the hotel. They obtained the man's room number from the manager. As they passed the room, they noticed that the door was open, which allowed Forsythe to see into the room. "[Forsythe]

observed defendant sitting on the bed and saw a woman counting out tinfoil bindles and placing them on a table near the bed. . . . Forsythe was approximately three to six feet away from the woman when he made this observation. Based on his training and experience, Forsythe concluded the tinfoil bindles contained heroin possessed for sale. Fearing the evidence would be destroyed if he did not act immediately, Forsythe pushed the door open all the way and walked into the room, accompanied by Vila." (*Id.* at p. 290.) Once inside the room, Vila opened one of the bindles and discovered that it contained a dark tar-like substance. The officers placed defendant and the woman under arrest for possessing heroin for sale, seized the contraband, and searched the hotel room. The *Ortiz* court upheld the warrantless entry and search of the hotel room despite the fact that the officers had not seen or heard any attempt to destroy the contraband. The court determined that the officers reasonably believed that, because the woman had seen the officers as they walked past the open door to the hotel room, the destruction of the contraband was imminent, thus creating an exigency justifying the entry and search.

In reaching this conclusion, the *Ortiz* court stated, "Viewed objectively, these facts were sufficient to lead a reasonable officer to believe that defendant or the woman saw, *or might have seen*, the officers. *Since it is common knowledge that those who possess drugs often attempt to destroy the evidence when they are observed by law enforcement officers* (e.g., *People v. Bracamonte* (1975) 15 Cal.3d 394, 405, fn. 6 [destruction by swallowing]), it was reasonable for Forsythe to believe the contraband he saw in front of defendant and the woman was in imminent danger of being destroyed. (*United States v. Santana* (1976) 427 U.S. 38, 43 ['Once Santana saw the police, there was . . . a realistic

2

expectation that any delay would result in destruction of evidence'].)  Thus, exigent circumstances justified the warrantless entry into the hotel room." (*Ortiz*, *supra*, 32 Cal.App.4th at p. 293, italics added.)  The *Ortiz* court continued, "Contrary to defendant's suggestion, the officers need not have been certain that they actually were seen by defendant or the woman.  It is sufficient the officers were presented with specific circumstances from which it reasonably may be inferred that defendant or the woman had, or might have, detected their presence.  (Cf. *People v. Gentry* [(1992)] 7 Cal.App.4th [1255,] 1262; *U.S. v. Parra* (10th Cir.1993) 2 F.3d 1058, 1063-1064 [exigent circumstances were demonstrated where officers believed that suspects 'might have observed them from the partially open door and might therefore begin destroying evidence'].)" (*Ortiz, supra,,* at p. 293.)

*Ortiz* is clearly instructive in this case.  During the surveillance operation, the officers on the scene observed one of the suspects, Hurtado-Ponce, peer inside a surveillance van and then immediately return to the driveway and say something to Ulloa and a third suspect. Ulloa and the third man in turn immediately stopped what they were doing with the vehicle and closed the doors, trunk and hood of the vehicle.  The third man then sped away in the vehicle while Hurtado-Ponce and Ulloa retreated into the house.  Based on these observations, the law enforcement officers on the scene could reasonably have inferred that their surveillance operation had been compromised and that the suspects were now aware that law enforcement officers were monitoring their activities.

3

The majority distorts the holding of the *Ortiz* court in its attempt to distinguish *Ortiz* from the present case. Specifically, the majority cites the *Ortiz* court's observations concerning the "fleeting" nature of the transaction in that case to suggest that this factor was pivotal to the court's conclusion that exigent circumstances existed. In fact, this factor was irrelevant to the court's holding that the possibility that the presence of law enforcement officers has been detected, alone, creates exigent circumstances that justify a warrantless entry. While the *Ortiz* court did mention the fleeting nature of the transaction and the possibility that the defendant or seller might leave the hotel room while officers attempted to obtain a search warrant, the court made these comments only *after* it had concluded that the possibility that the officers might have been seen was sufficient, in itself, to justify the warrantless entry of the hotel room. After reaching this conclusion, the *Ortiz* court stated that *even if* it were unlikely that the defendant or the woman had seen the officers, the warrantless entry would still have been justified because the circumstances were such that the presence of the remaining officer "was subject to imminent discovery if one of them waited outside the room while the other left to obtain a warrant." (*Ortiz, supra,* 32 Cal.App.4th at p. 294.)

The majority further attempts to distinguish *Ortiz* by stating, "Here, unlike the officers in *Ortiz*, the detectives did not directly observe criminal activity. In fact, the detectives saw nothing removed from the vehicle or carried into the residence—no actual narcotics, no suspicious packages, weapons or other contraband." If, in making this statement, the majority is suggesting that the officers in this case did not have reason to believe that there was contraband in the residence that might be destroyed, I would note

4

that such a suggestion is in direct conflict with the majority's conclusion in part II.A.1 that "the detectives had probable cause to believe there was contraband in the home."

The majority's efforts to distinguish *Ortiz* are based, at bottom, on second-guessing tactical decisions made by the law enforcement officers in order to preserve readily destructible evidence, in the face of overwhelming facts demonstrating that their surveillance operation had been compromised. The majority speculates that the officers might have been able to station "one of the many detectives on scene" for several hours while other officers obtained a warrant, with little description of the actions that such a detective might have taken to peaceably preserve the evidence without the risk of danger to that detective or to others at the scene. Similarly, the majority speculates, with no basis in fact, that an officer observing the residence "presumably could also see whether Ulloa was attempting to destroy evidence," and suggests that the "familial atmosphere" reduced the possibility of danger. In engaging in this speculation, the majority disregards the authorities cited above that have concluded that once suspects become aware of the presence of police, it is reasonable to conclude that any delay will result in destruction of evidence, and, in citing the "familial atmosphere" at the scene, ignores the inherent dangerousness of the situation. "The police interest in protecting against violence during the search of a home for narcotics has been widely recognized. 'In the narcotics business, "firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." ' (*Ybarra v. Illinois* (1979) 444 U.S. 85, 106 (dis. opn of Rehnquist, J.), quoting *United States v. Oates* (2d Cir. 1977) 560 F.2d 45, 62.) The danger is potentially at its greatest when, as here, the premises to be searched are a

5

private home, rather than a place of public accommodation as in *Ybarra.* '[B]ecause of the private nature of the surroundings and the recognized propensity of persons "engaged in selling narcotics [to] frequently carry firearms to protect themselves from would-be robbers" ( *People v. Lee* (1987) 194 Cal.App.3d 975, 983), the likelihood that the occupants [of a residence] are armed or have ready accessibility to hidden weapons is conspicuously greater than in cases where, as in *Ybarra,* the public freely enters premises where legal business is transacted.' (*People v. Thurman* (1989) 209 Cal.App.3d 817, 824–825.)" (*People v. Glaser* (1995) 11 Cal.4th 354, 367-368, fn. omitted.)

Given that, as the majority concluded, there was probable cause to believe there were narcotics in the home, that at least one suspect remained in the home, and that officers' surveillance had been detected, causing one of the suspects to speed off in the vehicle that was delivering the narcotics, there was, in my view, clearly probable cause for officers to believe that anyone remaining in the house might attempt to destroy evidence. Under *Ortiz,* the mere possibility that suspects in possession of contraband might be aware that law enforcement officers are present is sufficient to constitute an exigency since, as the *Ortiz* court succinctly stated, "[i]t is common knowledge that those who possess drugs often attempt to destroy the evidence when they are observed by law enforcement officers." (*Ortiz, supra*, 32 Cal.App.4th at p. 293.) Contrary to the majority's suggestion, there is no requirement that officers have heard toilets flushing or observed any other attempts to destroy evidence in order for there to be probable cause to believe that evidence might be imminently destroyed. Because the officers in this case had probable cause to believe that the suspects were in possession of contraband, and also

6

had reason to believe that the suspects had become aware that they were under law enforcement surveillance, there was probable cause to believe that contraband or evidence might be imminently destroyed.[1]  The warrantless entry and search were therefore justified by exigent circumstances.

AARON, J.

---

[1]     The majority notes that here, unlike in *Ortiz*, the officers suspected that there was an entire shipment of drugs in the residence, and then states, "[I]t is reasonable to infer that the shipment was not of a readily destructible amount."  In making this observation, the majority appears to suggest that the possible destruction of *some* of the contraband in the shipment would not justify a warrantless entry into the residence.  Of course, that is not correct.  Circumstances need not indicate that *all* of the contraband or other evidence might be destroyed in order for exigent circumstances to exist.