# Court of Appeals

## Tenth Appellate District of Texas

10-23-00236-CR

The State of Texas,
Appellant

v.

Wade Jonathan Breaux,
Appellee

On appeal from the
361st District Court of Brazos County, Texas
Judge David G. Hilburn, presiding
Trial Court Cause No. 21-03787-CRF-361

JUSTICE SMITH delivered the opinion of the Court.

## MEMORANDUM OPINION

Wade Jonathan Breaux is charged with the felony offense of Driving While Intoxicated – Third Offense or More. *See* TEX. PENAL CODE ANN. §§ 49.04, 49.09(b)(2). After a contested pretrial hearing, the trial court granted Breaux's motion to suppress evidence and his motion to suppress statements. The State argues that the trial court abused its discretion by granting Breaux's motions to suppress in finding that (1) Breaux had standing to challenge the

warrantless search of his friend's residence, and (2) law enforcement unreasonably believed that the homeowner's 12-year-old daughter had authority to consent to entry into the residence. We affirm.

## Background

On January 30, 2021, a concerned citizen called 9-1-1 and followed a suspected intoxicated driver to a residence in College Station. When Sergeant Kling arrived at the residence, he rang the doorbell. There was no response, so he rang the doorbell again. T.G., who was twelve years old at the time, called out, "Who is it?" from behind the closed front door. Sergeant Kling identified himself as a law enforcement officer and T.G. opened the door. Sergeant Kling learned that T.G.'s parents were out to dinner, and that their friend, Breaux, had recently arrived at the residence. When Sergeant Kling asked to speak with Breaux, T.G. said he was asleep on the couch. T.G. then invited Sergeant Kling into the home. Breaux's interactions with Sergeant Kling inside of the residence eventually led to Breaux's arrest for Driving While Intoxicated.

Breaux filed a pretrial motion to suppress evidence and a motion to suppress statements arguing that T.G. did not have authority to consent to law enforcement's entry into the home. The State countered that Breaux did not have standing to challenge law enforcement's warrantless intrusion into the

home, which belonged to his friend, Joe Gattis. Alternatively, the State argued that T.G. had authority to consent to Sergeant Kling's entry into the residence. The trial court granted Breaux's motions to suppress and filed findings of fact and conclusions of law.

## Standard of Review

Appellate courts review a trial court's decision to grant or deny a motion to suppress for an abuse of discretion using a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). We give almost total deference to the trial court's determination of historical facts and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Arguellez*, 409 S.W.3d at 662. We review *de novo* mixed questions of law and fact that do not turn on credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008).

When ruling on a motion to suppress, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). When the trial court prepares findings of fact with its ruling on a motion to suppress, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*,

204 S.W.3d 808, 818 (Tex. Crim. App. 2006). "Unless the trial court abused its discretion by making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal." *Flores v. State*, 177 S.W.3d 8, 14 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (citing *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991)). We then review the trial court's legal ruling *de novo*. *Kelly*, 204 S.W.3d at 818.

## Standing

The State first argues that the trial court erred in concluding that Breaux was an "overnight guest" with standing to challenge the warrantless entry into the Gattis residence. We disagree.

AUTHORITY

Standing is an individual's right to complain about an allegedly illegal governmental search, and therefore to exclude evidence. *See Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004). Only after a defendant has established standing to complain may we consider whether he has suffered a Fourth Amendment violation. *Id.* A defendant has standing to contest a search under the Fourth Amendment only if he had a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *Granados v. State*, 85 S.W.3d 217, 222-23 (Tex. Crim. App. 2002). An overnight guest has a legitimate expectation of privacy

in his host's home, and thus has standing to complain that he has suffered a Fourth Amendment violation. *Minnesota v. Olson*, 495 U.S. 91, 98-100, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); *Luna v. State*, 268 S.W.3d 594, 603 (Tex. Crim. App. 2008).

DISCUSSION

Breaux and Gattis were the only two witnesses called to testify at the suppression hearing. Relative to Breaux's standing, the trial court made the following findings of fact:

> 6. Gattis is a longtime close friend of Breaux. Breaux had chronic back pain due to a sacroiliac joint, or SI joint, of which Gattis was aware. Due to the friendship and Breaux's medical issue, Breaux had a standing invitation to spend the night at Gattis' residence. Breaux had stayed as an overnight guest on many occasions prior to January 30, 2021. Breaux had access to a key and code to access the home.
>
> 7. Breaux planned earlier in the day that he would be spending the night at Gattis' residence on January 30, 2021. Since Breaux's wife and kids were out of town the night of January 30, 2021, Breaux packed an overnight bag that day with the intent to spend the night at Gattis' residence. Gattis also saw Breaux's overnight bag at his home later in the evening. After packing the bag, Breaux went to eat a late lunch at TaD's. Following the late lunch, Breaux proceeded to go to the Gattis residence. Breaux's residence is in Saddle Creek. Breaux would have to travel in the opposite direction and a longer distance to get to his home at Saddle Creek from TaD's than he would drive to get to the Gattis residence. Breaux, upon entry to the Gattis residence, took some medication, laid on the couch and fell asleep.
>
> 8. No evidence suggests that Breaux knew he was being followed by the 911 caller or any emergency vehicle, or that he knew he was

suspected by law enforcement for any criminal activity during the time that Breaux drove to Gattis' residence or during the time that Breaux entered and remained at Gattis' residence, until police woke him.

9. Breaux was permitted entry into the Gattis home by [C.G.], Gattis' 16-year-old daughter. [C.G.] called her mother to let her know that Breaux was at their home. Neither Gattis nor his wife revoked their standing invitation to allow Breaux to spend the night. Gattis testified to his belief that Breaux was intending to be an overnight guest on January 30, 2021, and that Gattis was okay with Breaux staying overnight at his home.

…

11. From the front door, Sgt. Kling could see a man sleeping on the couch…[T.G.] stated that Breaux was asleep on the couch.

The trial court also made the following relevant conclusions of law:

1. Breaux had standing to challenge the entry of the home owing to his status as an overnight guest at the Gattis residence […]

5. Breaux is an overnight guest at the Gattis residence because he intended to stay overnight at the residence on January 30, 2021. His intent is evidenced by packing an overnight bag earlier in the day, prior to going to lunch at TaD's. He left TaD's and went in the direction of the Gattis residence versus his own home, which would have been in the opposite direction. The Gattis residence was much closer to TaD's than his own residence. Breaux had a standing invitation to spend the night at the Gattis residence, had spent the night on many prior occasions, and that invitation was never revoked by the homeowners. Breaux has access to a key and code to the residence and was also permitted entry by Gattis' teenage daughter. Upon entry, Breaux laid down and fell asleep, which is indicative of his intent to spend the night. Breaux was not aware of a 911 call or that law enforcement officers suspected him of criminal activity at the time he went to the Gattis residence.

The State specifically challenges the portions of the trial court's finding of fact number seven and conclusion of law number five relating to Breaux's overnight bag. These findings are supported by Breaux's testimony at the hearing that he packed an overnight bag before he left his house and Gattis's confirmation that he observed the overnight bag in the living room. The State contends that their testimony is not credible and must be disregarded because a complete review of the body camera video admitted into evidence at the suppression hearing "shows there was no overnight kit/bathroom bag in the living room."[1] In support of this argument, the State also notes that law enforcement did not take possession of an overnight bag when attempting to gather Breaux's property subsequent to his arrest.

To overcome a trial court's determination of historical fact, a video must present indisputable visual evidence to the contrary. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000). Having reviewed the body camera video, we do not agree with the State's assertion that it indisputably refutes the trial court's findings that Breaux packed an overnight bag that was later observed by Gattis in the living room of the residence. Sergeant Kling's

---

[1] In its reply brief, the State also notes that Gattis did not testify that he observed the overnight bag "later" in the evening. At the hearing, Gattis agreed to the question, "In fact on this night you observed a travel bag -- a small bathroom bag that was with him in the living room, correct?" However, this finding is supported by the record when considered in conjunction with the immediately preceding sentence – Breaux packed an overnight bag "that day," and Gattis observed it "later in the evening." We therefore do not disregard this fact finding.

interaction with Breaux is mostly confined to one section of the living room. His body camera video does not provide footage of every place in the living room where the overnight bag reasonably could have been located and observed by Gattis; therefore we cannot agree the video provides indisputable evidence contrary to the trial court's findings about the overnight bag. We also cannot agree that the trial court's finding is unsupported by the record simply because law enforcement failed to collect the overnight bag after Breaux was arrested.

Affording appropriate deference to the trial court's findings of fact, we conclude that the trial court was correct in determining that Breaux had standing as an overnight guest. Breaux was aware that his family would be out of town for the night, so he planned to utilize his frequently-exercised standing invitation to spend the night at the Gattis residence. He packed an overnight bag before leaving his house to have lunch at a restaurant close to the Gattis home. Though Gattis's daughter let him into the house upon arrival, Breaux also had key and code access to the house. Once inside, Breaux took medication for his chronic medical issue and went to sleep on the couch. Gattis confirmed at the hearing that, although he did not know why Breaux was at his residence that particular evening, he believed Breaux was intending to spend the night, was "okay with that," and did not revoke Breaux's invitation

to stay at the residence. Breaux had standing as an overnight guest to challenge the warrantless entry into the Gattis residence.

**Consent**

The State contends that it proved by a preponderance of the evidence that 12-year-old T.G. had apparent authority to consent to Sergeant Kling's entry into the residence, and therefore the trial court abused its discretion in granting Breaux's motions to suppress. We disagree.

AUTHORITY

Entry into a residence by law enforcement is a "search" for Fourth Amendment purposes. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011). Consent searches are an established exception to the warrant and probable cause requirements of the Fourth Amendment and Article I, Section 9 of the Texas Constitution. *See Balentine v. State*, 71 S.W.3d 763, 772 (Tex. Crim. App. 2002); *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985). A third party with "common authority" over the place to be searched can consent to a search to the detriment of another's privacy interest in that place. *Hubert*, 312 S.W.3d at 560. Common authority is shown by

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 560-61 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

Even if the third party lacks actual authority to consent, consent may be validly obtained from an individual with "apparent authority" over the premises. *Limon*, 340 S.W.3d at 756. If an officer "reasonably, though erroneously, believes that a third party purporting to provide consent has actual authority over the place or thing to be searched, apparent authority exists and the purported consent from the third party can serve to make the search reasonable." *Hubert*, 312 S.W.3d at 561.

The objective standard for evaluating apparent authority is whether the facts available to the officer at the moment permit a person of reasonable caution to believe that the consenting party had authority over the premises. *Limon*, 340 S.W.3d at 756. Relevant here, the Fourth Amendment does not categorically prohibit a minor child from consenting to entry; rather, depending on the specific circumstances and "taking into account 'widely shared social expectations' and 'commonly held understanding,' it may be reasonable or unreasonable to believe that a child has authority to consent to a particular intrusion." *Id.* at 757. It is the State's burden to demonstrate by a preponderance of the evidence that the person who consented to the search had apparent authority to consent. *Id.* at 757 n. 15. Whether an officer was

reasonable in finding that a third party had apparent authority to consent is a mixed question of law and fact which we review *de novo* on appeal. *Hubert*, 312 S.W.3d at 559-60.

DISCUSSION

On appeal, the State does not argue that T.G. had actual authority to consent to Sergeant Kling's entry. The trial court found that T.G. did not have actual authority, which is supported by Gattis's testimony at the hearing that T.G. was not permitted to let strangers into the home and that he preferred police to call him for permission to enter the residence. However, within its apparent authority argument, the State urges us to consider that Gattis did not "revoke/disapprove" of T.G.'s consent and did not ask Sergeant Kling to leave the residence when they later spoke over the phone and when Gattis returned to the residence. In our apparent-authority analysis, we consider the facts available to the officer at the moment of entry. *See Limon*, 340 S.W.3d at 756. Sergeant Kling had already entered the home and was speaking with Breaux before the phone call with Gattis occurred and before Gattis returned to the residence.

We find that the facts available to Sergeant Kling at the moment that T.G. invited him into the residence would not permit a person of reasonable caution to believe that she had authority to consent to his entry. The trial

court found that it was not credible for Sergeant Kling to believe that T.G. was a child of "significant maturity." *See Limon*, 340 S.W.3d at 758. This finding is supported by video evidence showing that Sergeant Kling rang the doorbell two times, waiting over one minute on the porch before T.G. responded with "Who is it?" from behind the closed front door. *See id.* (noting that a teenager who opened the door by himself indicated a greater level of authority to permit entry than if he had answered "What do you want?" from behind the door). T.G. did not open the door until Sergeant Kling identified himself as a law enforcement officer, and even then, she opened the door only slightly. Further, Sergeant Kling's initial response upon seeing T.G. was to seek to speak with an adult. He asked if her parents were home. T.G. explained that her parents were out at dinner but their friend, Breaux, had recently arrived at the residence.

At this point, Sergeant Kling was aware that at least one adult was inside of the residence. Though T.G. identified Breaux as a family friend, Sergeant Kling was unaware of exactly what authority over or interest in the residence Breaux might possess.[2] Sergeant Kling then asked if he could speak with Breaux. When T.G. responded that Breaux was asleep, Sergeant Kling hesitated. He still did not ask T.G. for consent to enter the home. The fact

---

[2] Sergeant Kling was already standing in the entryway of the home, having accepted T.G.'s invitation to enter, before he asked T.G. whether Breaux was a resident.

that Sergeant Kling never asked T.G. for consent to enter supports a conclusion that, based on the facts known to Sergeant Kling at the time and taking into account widely shared social expectations and commonly held understanding, it would be unreasonable to believe that T.G. had authority to consent to his entry.

## Conclusion

We conclude that the trial court did not abuse its discretion by granting Breaux's motions to suppress.  Accordingly, we overrule the State's sole issue on appeal and affirm the trial court's orders granting Breaux's motions to suppress.

_____
STEVE SMITH
Justice

OPINION DELIVERED and FILED:  May 29, 2025

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
Do not publish
CR25

